CHANCERY.

*Case* 124.

# Scarborough *vs* Watkins and Wife.

### APPEAL FROM THE DAVIESS CIRCUIT.

*Administrators. Conveyances. Husband and Wife. Registry of deeds.*

*September* 25.

JUDGE SIMPSON delivered the opinion of the Court.

An adm'r. who neglected, for more than two years, to collect a debt due to his intestate, held accountable to distributees.

THE plaintiff in error questions the correctness of the decree of the Court below, in settling his accounts as administrator *de bonis non* of Philip Thompson, deceased, and also as administrator of Sally Thompson, deceased, the widow of said Philip Thompson.

1. He insists that he has been unjustly held accountable for a debt on Mosely, due to his intestate. He rests his exemption from liability for this debt, on the ground that Mosely was the uncle of the children of his intestate, and he was requested by them not to use coercive measures for its collection; in consequence of which he indulged the debtor until, by his insolvency, the debt was lost. There is no testimony, however, that such a request was made, and as there is no controversy in regard to the ability of Mosely to have discharged the debt, during a period of almost two years after the time that the note came into the hands of the administrator, he was justly held liable to the distributees for its amount.

An adm'r. held accountable to distributees for failing to collect a debt, when he alleged and failed to show there was a valid set-off against it.

2. He was charged with a debt that he failed to collect due to his intestate, by a man named Crow. He attempted to prove by Crow, that he had a set-off against the debt sufficient to cover its whole amount; and he relied upon this evidence to discharge him from liability for the debt, on account of his failure to enforce its collection, whilst Crow was able to have paid it. If it be conceded that Crow's testimony was competent, for the purpose for which it was offered, still it does not satisfactorily appear by his evidence, that he did not justly owe the debt. His testimony is not explicit; it is vague and unsatisfactory, both as to the character and amount

of the alleged set-off. Considering the uncertain and indefinite character of the evidence, in connection with the fact that the pretended set-off originated before, and not after, the execution of the note, and its correctness is, therefore, repelled by the note itself, it seems to us that the conduct of the administrator in reference to the debt, was such as to subject him to its payment.

3. Sally Thompson, the widow of Philip Thompson, deceased, administered on his estate, and, during her lifetime, employed the plaintiff in error, who had married one of her daughters, to assist her in the management of her intestate's estate. For his services in this respect, he claimed six per cent. upon the money collected by him, which he alleged to be upwards of twelve thousand dollars. His claim was disallowed. In this particular, he insists that great injustice has been done him. It appears in proof, that, after his marriage, his wife and himself lived with his mother-in-law, and he devoted a portion of his time to assisting her in attending to her business as administratrix, but still followed his usual avocation. There is no evidence of the amount of money collected by him, or of any agreement, by which he is entitled to a compensation of six per cent. on his collections. But there is evidence of a contract that he was to be compensated for his trouble. It is contended, that the board of himself and wife was a sufficient equivalent for all the services rendered by him. His mother-in-law, however, may not have contemplated any charge against him on this account, and even if it were to be taken into consideration, in placing an estimate upon his services, the proof shows that the services were worth more than the boarding of himself and wife. We think, therefore, that, although the claim was not sustained to its full extent, that it should not have been wholly disallowed. The sum of three hundred dollars would be, according to the testimony, about a reasonable compensation for the services rendered by him, taking into consideration the fact that, whilst he was so employed, his wife and himself were boarded by Mrs. Thompson.

SCARBOROUGH
*vs*
WATKINS & WIFE

An adm'r. *de bonis non* allowed a compensation for services rendered in the management of the business of the estate at the instance of the former adm'r.

SCARBOROUGH
vs
WATKINS & WIFE

It is improper to charge an adm'r. with a debt which is in process of collection, when he has not been guilty of neglect in proceeding in its collection.

4. The administrator was charged with a debt on Watson, which had not been collected, although it was in the process of collection. There is no imputation of negligence on the part of the administrator in attending to the collection of the debt, nor any reason manifested why he should be held accountable for it. He was charged with it, because it was supposed that it would be collected. It is not positively certain that it will be; if it should, however, it will then be his duty to pay it to the distributees; but it is not just or proper, under the circumstances, that he should be compelled to pay it, before he receives it, and it would be still more unjust to require him to do it, if it should be eventually lost.

5. Mrs. Thompson, as administratrix, had hired a negro girl to a man by the name of Smith, who had failed to comply with the terms, by executing a note, with good security, for the hire. Smith, however, obtained possession of the slave, and retained her under the contract, notwithstanding this failure upon his part, and died before the expiration of the year insolvent. Mrs. Thompson died during the year, and the plaintiff in error, who was appointed administrator of her estate, and administrator de bonis non of the estate of Philip Thompson, deceased, about five months after Smith hired the slave, and got her into possession, was held responsible for this hire. This was evidently wrong. If Mrs. Thompson might have regarded the contract of hiring void, because the hirer had failed to comply with the terms, yet, as she had not done so, but permitted Smith to have possession of the slave, from which the presumption arises, that she had waived a compliance by him with the terms, it would have been a hopeless undertaking, upon the part of the plaintiff in error, to have forced Smith to surrender the possession of the slave. It was upon the supposition that it was his duty to have done this, he was held liable for the hire. The slave had been hired for the year, and as administrator de bonis non, he had no control over her. Mrs. Thompson was, no doubt, liable for the hire, having permitted Smith to take the slave without any security for its pay-

ment; but her liability was a charge upon her estate, and did not devolve a personal liability upon her administrator. But even admitting that, after the death of Mrs. Thompson, the plaintiff in error had a right, upon becoming her administrator, to treat the contract of hiring by Smith as void, still, if he had resorted to a suit to obtain possession of the slave, it is, at least, problematical whether he would have succeeded in the accomplishment of the object, before the end of the year. There is, therefore, no plausible pretext for holding him liable for this hire.

The most important question, however, in this case, arises upon the defendant's cross errors.

The plaintiff in error had married one of the daughters of Philip Thompson, deceased. His wife, a few years after their intermarriage, died without issue. She inherited from her father, and also from two of her brothers, who died in infancy, and without issue, a considerable real estate, some of which was situated in Daviess county, where she and her husband resided, and the remainder in other counties in this State. In 1846, her health being bad, and her recovery considered hopeless by herself and friends, she, in conjunction with her husband, executed deeds, conveying all her real estate to S. M. Wing, who, immediately thereafter, re-conveyed. the same to her husband.

The deeds executed to Wing, each contain a recital substantially in the following language; "Whereas, the said Emily Scarborough is anxious and determined to vest the whole legal and equitable title to the lands and lots hereafter described, in the said George Scarborough, her husband, the title to which said lands descended to, and vested in her, as one of the co-heirs of Philip Thompson, deceased, her father, and of her infant brothers; and to effect that object, has determined to convey said lands and lots to the said Samuel M. Wing, the party of the second part, with the intent and object, that he may and shall re-convey the same to the said George Scarborough, in fee simple." These deeds were acknowledged by Scarborough and wife, before the clerk of the Daviess County Court, in due and legal form, and

recorded in his office on the 16th day of February,
1846, the day on which they bear date. But they were
not recorded, or lodged for record, in the other counties
in which the lands conveyed are situated, until more
than a year afterwards.

One object of the present suit was, to have a division
of the real estate of Philip Thompson, deceased, among
his heirs. Emily Scarborough left a brother and seve-
ral sisters alive at the time of her death, who claimed
her share, as her heirs at law; it was also claimed by
her husband, under the foregoing deeds of conveyance,
and his claim was sustained by the Court below. The
defendants, by their cross errors, assail this part of the
decree.

The validity of these conveyances is contested on
two grounds.

First. It is contended that the statutes in force in this
State, regulating conveyances, do not authorize a *feme
covert* to make a deed, the avowed object and intent
of which is, to vest the title to real estate in her hus-
band.

Second. That such gifts are against the policy of the
law, and deeds executed for the purpose of creating
them, should be treated as null and inoperative.

Another question is raised in relation to the validity
of the deeds, so far as they embrace land not within the
county of Daviess, inasmuch as they were not record-
ed in the counties where the land lies, within the time
required by law.

First. The statutes authorizing a married woman to
execute a deed of conveyance, in conjunction with her
husband, make the deed, when acknowledged by the
parties, with certain legal formalities upon the part of
the wife, and recorded, as effectual for every purpose, as
if she were an unmarried woman. These statutes are
sufficiently comprehensive to empower a married wo-
man to make a deed of any description; not merely a
deed of bargain and sale, founded upon a valuable con-
sideration, but a deed of gift, or of mortgage, or re-
lease, or a deed of conveyance for any purpose what-
ever. The deeds, then, to Wing must be considered

as sufficient to pass the title to him, unless there be something in the recitals that they contain, evincing the design of their execution, which will preclude them from having this operation and effect.

The argument is, that inasmuch as the wife cannot make a deed to the husband, nor the husband and wife in conjunction make such a deed, therefore the law will not tolerate the accomplishment of an object indirectly, which cannot be directly attained.

The wife cannot convey to the husband, because she is not authorized to make a deed, unless her husband joins with her in its execution. She and her husband cannot, in conjunction, make a deed to the latter, because two parties are necessary to every deed, and one person cannot occupy the attitude both of bargainer and bargainee, or donor and donee. But these reasons do not apply, when the deed is executed to a third person. There is nothing, then, to prevent the operation of the deed, and the title will certainly pass, unless there be some principle of law, or rule founded on public policy which prohibits the execution of conveyances made for the purpose, avowed on the face of these conveyances. This brings us to the consideration of the second ground relied upon, in opposition to the validity of these deeds.

Second. It is a maxim of the common law, that the husband and wife cannot make a valid contract with each other, during the coverture. The reason generally assigned is, that the wife having lost her legal unity, she and her husband are one person in legal contemplation, and it would be absurd for any person to enter into a contract with himself. This, however, is not the true reason. The law does not, in all respects, consider husband and wife as one person, for a conveyance of land to the wife vests it in her, and not in her husband; so that, in fact, they are, as it regards real estate, for many purposes, viewed as two distinct persons. The true reason of the rule is, that the wife is under the coercion of the husband, and being thereby deprived of freedom of volition, should not be bound by her contracts with him: *Co. Litt.* 132, (*Thomas' Edition.*)

The wife cannot make a valid conveyance of her lands to her husband; she cannot convey except jointly with her husband, nor can she and the husband make a conveyance to the husband, because two parties are necessary to every deed.

From this maxim of the common law, the doctrine seems to have been deduced, that the husband and wife could not convey their lands to each other. Still, if the husband conveyed to a stranger who, by agreement, immediately conveyed to the wife, the title thereby became vested in the wife. If the object of the law had been to prevent husbands from conveying their real property to their wives, such conveyances must have been treated as illegal and void. They would have been a fraud upon the law, and an evasion of principle, which the law would have condemned. This circuitous mode of passing the title from the husband to the wife, originated, no doubt, from the prevailing idea of their legal identity.

But the power of the husband to make a conveyance, which would indirectly vest the title in the wife, does not prove the existence of a similar power in the wife. He is not deprived of the capacity of contracting. As a general rule, she is, on account of the supposed coercion of the husband.

A conveyance in England of husband and wife, was affected by fine and recovery, in Kentucky the same thing is affected by deed of bargain and sale, and the privy examination and acknowledgment by the wife.

The general rule, that the wife cannot so contract as to bind herself, is, however, subject to exceptions. The wife, in conjunction with her husband, can convey away her real property. In England, this can only be done by a fine, or common recovery, which are affected by the interposition of a Court. In this State, it can be done in the mode prescribed by the statutes' regulating the subject, and, when done in that manner, it is considered as the free and voluntary act of the wife, relieved from all coercion by the husband.

Supposed to be free from the coercion of her husband, in this mode of disposing of her real estate, there seems to be no good reason why she should not be permitted to make a conveyance, for the purpose of investing him with the title to her real property. It may be contended, however, that although she may be presumed, when conveying away her land in the mode prescribed by law, in the general, to be acting freely, and without any improper influence on the part of the husband, still, this presumption cannot be indulged, where

the conveyance is made expressly for the benefit of the husband.

It is only necessary to consider the effect of almost every conveyance of the wife's real estate, made by her and her husband, to perceive the fallacy of this argument. If made upon a sale of the property, the money arising from the sale vests in the husband, and he can use it according to his discretion. In such a case, the conveyance is substantially for the benefit of the husband; as much so as if the title was transmitted to him. If the doctrine were established, that conveyances made for the purpose of vesting the title to the real estate of the wife in the husband, are void, the result would be, that the same object would be accomplished by a sale of the estate for money, which would belong to the husband. There is no greater reason to infer an improper influence by the husband in the one case, than in the other.

Upon the question of a supposed improper influence by the husband, in cases like the present, the rule in equity, as to the power of a married woman to bestow her separate estate upon her husband, has an important bearing. Her right to give her separate estate to her husband, is firmly established. It is true, Courts of equity examine every such transaction with great caution, and with some apprehension of undue influence, but unless such influence is evinced, the gift will be considered valid: (2 *Story's Equity Jurisprudence*, 764–5; *Clancy on Married Women*, 350.) If, however, the doctrine contended for, that in the case of a gift by the wife to the husband, a presumption of improper influence arises, had been recognized as just, Courts of equity would never have sanctioned such gifts, but must have declared them illegal and void.

There is, in this case, not the slightest evidence of any misrepresentation, undue influence, or improper conduct by the husband. The design seems to have been cherished, if it were not originated by the wife. She had no children; her sisters and brother had an ample estate of their own. Her husband, as may be presumed from the evidence, was, in a great degree,

That a wife may invest her husband with her separate property, is a well established doctrine; but Courts of equity will look with a close scrutiny into all such transactions, and with some apprehension of undue influence, but if none is discovered the gift will be held valid; (2 *Story's Eq.* 764–5; *Clancy*, 350.)

destitute of property when they were married. Under these circumstances, there is nothing calculated to excite the suspicions of the Chancellor, or to create surprise, in the desire which she expressed, to give her property to her husband. The nature and effect of the transaction, were fully understood by her. She could hardly have been deceived as to its object, which was explicitly avowed in the deeds themselves. Indeed, there seems to have been no attempt to establish actual fraud, or the exercise of undue influence on the part of the husband, in procuring the execution of the deeds by her.

An objection has been made to this transaction, growing out of the attitude occupied by the husband, to the heirs at law of his wife. He was the statutory guardian of some of them, who were still infants. It is contended, that he was thereby precluded from availing himself of the benefit of his wife's gift.

It is certainly the duty of a guardian to protect all the interests and rights of his wards; and the law condemns any act of his, or the acquirement of any right by him, inconsistent with this duty. But the wards of the husband had no interest in, or right to, the estate of his wife. It was no part of his duty to secure to them the transmission of the estate, by descent, from their sister. The imposition of such a duty would have rendered the estate inalienable by him and his wife, during the continuance of the relationship of guardian and ward, between him and his wife's brothers or sisters. The proposition has no foundation in law or reason, and the relation of the parties to each other, can have no influence upon the legal effect of the deeds.

Our conclusion, then, is, that a conveyance by husband and wife, of the real estate of the wife to a third person, executed according to law, under an agreement that the estate is to be re-conveyed to the husband, is, if the estate be so re-conveyed, effectual for the purpose of vesting the title in the husband, and if the transaction be fair and untinctured with fraud, is not prohibited by any rule of law or public policy.

A conveyance by husband and wife to a third person, of the real estate of the wife, for the purpose of being conveyed to the husband to invest him with the estate of the wife, is valid, if made

Third. We have, in the last place, to inquire into the legal effect of the failure to record the deeds within the time prescribed by law. The deeds having been duly recorded in Daviess county, the title to so much of the real estate of the wife as lies in that county, vested in the husband. But as a considerable part of the estate is in other counties, the inquiry is an important one to the parties interested.

There were three deeds executed by Scarborough and wife to Wing; one for land in Daviess county, one other for land in Union, and the other was a general conveyance of all the real estate in Kentucky belonging to the wife.

According to the laws in force previous to the passage of the act of 1831, (1 *Stat. Law*, 453,) it was necessary to render a deed valid against a *feme covert* grantor and her heirs, that the deed and privy examination should be recorded within eight months, in the county in which the land was situated, and if not so recorded, the deed was not obligatory upon the *feme* or her heirs: *Applegate* vs *Gracy*, (9 *Dana*, 215.)

Does the 10th section of the act of 1831, change the law upon the subject, and give effect, from the time of recording, to the deed of a *feme covert*, upon its being recorded after the expiration of eight months? It was held by this Court, in the case of *Applegate* vs *Gracy*, (*supra*,) that it did not extend to deeds of *femes covert* made before its passage, not recorded in time, and as to which, the time for recording had expired before the passage of the act. But as the deeds in this case were made subsequent to the passage of the act, the decision of that question does not dispose of the one now under consideration.

Nearly all the reasons, however, upon which that opinion of the Court was based, apply with as much force to the deeds of married women made after, as to those that were made prior, to the passage of the act. In addition to the reasons there given, (which need not now be reiterated,) to demonstrate that, by a reasonable and just construction of this act, its tenth section does not extend to, or embrace the deeds of husband

SCARBOROUGH
*vs*
WATKINS & WIFE

without coercion or undue influence of the husband.

Deeds of conveyance from *femes covert*, do not have the effect of passing title to the purchasers without they are recorded within the time prescribed by law. The statute of 1831 does not apply to deeds made by *femes covert*.

and wife, the following considerations, some of which arise out of the circumstances of the present case, would seem, conclusively, to forbid any other construction.

Our statutes upon the subject of conveyances, in speaking of deeds generally, and making provisions in relation thereto, evidently do not include those deeds which are made by husband and wife, but all their provisions intended to apply to the latter class, are specific, and designate such deeds particularly.

As such had been the uniform character of all the previous legislation on the subject, the rule which requires that statutes *in pari materia,* are to be considered together, to ascertain the true construction, would exclude deeds made by husband and wife, from the operation of the tenth section of the act of 1831, unless it be apparent, from a consideration of the whole act, that the Legislature, in its passage, had disregarded this distinction, and intended to apply language descriptive of deeds generally, to those executed by husband and wife. But so far from this being the case, we find that the act recognizes this distinction, and in its provisions in reference to deeds made by husband and wife, points out specifically the class of deeds to which the provisions are intended to apply. When, therefore, the language of the act is general, it applies to all others but the deeds of husband and wife; when it applies to the latter, the language used is special, and refers to them alone.

The section of the act under consideration, makes deeds, duly proven or acknowledged, but not lodged to be recorded in the proper office within the time prescribed by law, if subsequently recorded in the proper office, as effectual to all purposes, *from the time of recording,* as if recorded within the time prescribed by law.

Now deeds, in general, pass the title from the grantor at the time of their execution, and registration is only necessary to make them effectual as to creditors and subsequent purchasers, without notice. There is no difficulty, therefore, in the application of this section of

the act to such deeds.  They are valid between the parties, when executed.   They have not the efficacy of recorded deeds, until they are recorded in the proper office, but from *the time of recording*, and not from the time of their execution, they are valid as to creditors and subsequent purchasers.

The deeds of married women do not, however, pass the title of the *feme* at the time of their execution, unless the deed be recorded in the time prescribed by law. The recording of the deed of a *feme covert* is necessary, not merely to make the deed valid against creditors and subsequent purchasers, but to pass the title out of the grantor.   In what manner will this section of the act operate, if applied to the deed of a *feme covert?*.  It will only give it effect *from the time of recording*.  Such is the language and obvious meaning of the statute, and the undoubted intention of the Legislature in its passage.   The deed, then, will be valid between the parties from the time of recording, and the title will pass out of the grantor at that time.   But suppose the deed not to be recorded for half a century after its execution, the title will still remain in the grantor, and upon her death pass to her heirs at law.   In this case, the *feme* died about two months after the deeds were executed by her.   Had they been recorded in the time prescribed by law, although recorded after her death, the title would have passed, notwithstanding the death of the grantor, as was decided in the case of *Prewitt* vs *Graves*, (5 *J. J. Marshall*, 123,) because the law on the subject gave them effect, when recorded in proper time, not merely from' the time of recording, but from the time of their execution.   But under this section, they are made to take effect, not from their execution, but only from *the time of recording;* and as, in this case, the grantor was then dead, and the title had descended to her heirs at law, the deeds could not then be made effectual to pass the title.

The utter impracticability of applying this section of the statute to the deeds of a *feme covert*, as illustrated by the facts of the present case, proves, almost irresistibly, that the Legislature did not intend it to have such

an application. Had such been the intention of the Legislature, the deed of a *feme covert* would, no doubt, have been particularized, and efficacy given to it when recorded, not merely from the time of recording, but from the time of its execution.

But it may be argued, that the distinguishing trait between the deed of a *feme covert*, and those made by other grantors, that the title in the former case does not pass out of the grantor, unless the deed be recorded in due time, but does, in the latter, immediately upon its execution, was intended to be, and was abolished by the act of 1831.

If the Legislature had intended to make such an important and radical change in the law, and to give to the deed of a *feme covert* a different effect from that which it had under the act of 1748, and all the subsequent statutes on the same subject, the object would, no doubt, have been expressly avowed and carried into effect, by a direct provision for that purpose, and not left as a matter of uncertain deduction and conjecture.

And even such a deduction is not authorized by any part of the act, except the first section, which applies exclusively to the deeds of non-residents, and would not, if admitted to arise under that section, extend to, or embrace deeds made by residents.

The result is, that we regard the deeds made by Mrs. Scarborough, so far as they embrace lands not within the county of Daviess, as inoperative, because they were not recorded within the time prescribed by law; and, consequently, the title to such lands has descended to, and become vested in, her heirs at law. It was, therefore, erroneous to decree to Scarborough the lands which had belonged to his wife, lying out of the county of Daviess.

Wherefore, the decree is reversed on both the original and cross errors, and cause remanded, for further proceedings and decree consistent with this opinion.

*J. & W. L. Harlan* for appellant; *Robertson* for appellees.