Case 22.

PET. EQ.

Barnes and wife *vs.* Edward, (of color.)

and

Edward *vs.* Barnes and wife.

APPEALS FROM LARUE CIRCUIT.

1. The county court of the county of the residence of a testator alone has jurisdiction to hear proof of his will. (*Revised Statutes, sec.* 27.) Such was the law prior to the passage of the Revised Statutes.

2. Courts of chancery have jurisdiction to establish wills which have been suppressed or destroyed; and the jurisdiction for that purpose belongs to the county where the will should be recorded. (*McCall vs. Vallandingham*, 9 *B. Monroe*, 550.)

3. No suit can be maintained for freedom claimed under a will which has not been proved or established.

4. Any court of equity, where one claiming freedom under a will, not proved. may be restrained of his liberty, has jurisdiction to restrain the removal of such an one until a reasonable time is given to establish the will.

BARNES, &c.
*vs.*
EDWARD,
and
EDWARD
*vs.*
BARNES, &c.

This suit was brought in the Larue circuit court by Edward, (*alias Ned,*) a man of color, against Barnes and wife, asserting his right to freedom, under the will of Zera Wilcox, and claiming compensation for his labor since the death of Wilcox—about two and a half years. It is alledged, that the plaintiff, Edward, was the slave of Wilcox, who, by his will, duly made and published in the county of Nelson, the county of his residence, emancipated and set free the said plaintiff, and that Barnes and wife had destroyed said will a short time before Wilcox's death, and after Wilcox's death, had taken the plaintiff into their possession, and continue to hold him as a slave.

The answer admits that a will was made, and does not deny the capacity of Wilcox to make a will, but relies upon a revocation thereof. The circuit court decided that the plaintiff was entitled to freedom, &c., and the defendants appealed to this court.

*James Harlan* for appellants—

Zera Wilcox, a citizen and resident of Nelson county, died at his residence, in that county, about the last of July, 1850.

Administration of the personal property, &c., of said Wilcox, was granted by the Nelson county court in August, 1850.

In January, 1853, Edward, a man of color, instituted an action in equity against William Barnes and wife, in which he alledges he was the slave of Wilcox—that Wilcox made and published his last

Barnes, &c.
*vs.*
Edward,
and
Edward
*vs.*
Barnes, &c.

will and testament in due form of law a short time before his death, and that by the agency of the defendant, William Barnes, the will was destroyed a few days before Wilcox died. That by the provisions of the will, as published, the plaintiff, Edward, was emancipated. That since the death of Wilcox, the defendant Barnes had taken plaintiff into his possession, and claimed him as his slave. Plaintiff prays that his right to freedom may be established by the judgment of the court.

The main allegations of the petition are denied, and the circuit court rendered judgment in favor of the plaintiff, and to reverse which, the defendants have appealed to this court.

The action was brought in the *Larue* circuit court, and the first question to be decided by this court, is, whether that court had jurisdiction of the case? It is a case to establish a will which is alledged to have been destroyed; and I contend the action should have been brought in the county where the decedent was domiciled and died. Sec. 95, of the Code of Practice, provides: " An action to *establish* or set aside a will, *must* be brought *in the county* in which the will, *if valid*, ought, according to law, to be recorded." There is no room for construction here. If Wilcox made and published his last will in due form of law, and by accident or design it was destroyed, the proceeding to establish it must be brought in the county where, if valid, it ought to be recorded. If the circuit court for Larue county has jurisdiction, so has the county of Greenup, which adjoins the state of Virginia, and lies opposite to the state of Ohio; and the county of Fulton, which adjoins Tennessee and lies opposite to the state of Missouri.

It would be extremely inconvenient for parties and witnesses, if any circuit court in the state in which one of the defendants could be served with process could assume jurisdiction to establish or set aside a will.

BARNES, &c.
*vs.*
EDWARD,
and
EDWARD
*vs.*
BARNES, &c.

The question of jurisdiction was presented by the defendants in the circuit court in due form.

2. Ought not all of the parties in interest to have been brought before the court before any judgment was rendered in the case? Can each person claiming to be a devisee under a will lost, or destroyed, maintain his separate action to obtain the benefit of a devise? That, to me, is as plain a question as the question of jurisdiction.

3. The evidence as to the revocation or obliteration of the will, and the capacity of the testator at the time he tore his name from it, is contradictory, but the weight of it is in favor of the appellant and against the judgment rendered by the circuit court, and consequently the judgment ought to be reversed. It would be a profitless task to marshal the testimony on either side as it can be properly understood only by reading the depositions.

*W. Howell* for appellee—

The testimony shows that Wilcox was ill with flux, and about the last of June or 1st of July, 1850, he made his will. It was written by B. B. Summers, and executed, and attested by R. Barnes and R. S. Strother. The subscribing witnesses and draftsman establish the will, and prove the capacity of the testator. They prove that the first clause provided for the payment of the debts of the testator. The second clause provided for the emancipation of the plaintiff, Ned. The contents of the will thus far is proved beyond controversy. But it is alledged in the defense that the will was revoked, and this is the great point in the controversy, and upon this point the testimony is conflicting. Three witnesses testify that the testator was of sound mind when he cut his name from the will. Five witnesses testify to his incapacity at the same time. The weight of testimony is against his capacity when the act was done. The five witnesses had the better opportunity of knowing the capacity of the testator. His attending physician states that the change took

BARNES, &c.
*vs.*
EDWARD,
and
EDWARD
*vs.*
BARNES, &c.

place in the condition of Wilcox, the testator, two or three days before Barnes was sent for; he was present when Barnes brought the will, and Barnes got him to present it to Wilcox, who was then incapable of doing any business.

Nelly Skeggs, who lived about the house, had been with Wilcox all the time, and had a good opportunity of knowing his condition of mind, testifies to his incapacity, and so does Allen Abell and E. Hall. Those witnesses who testify to the capacity of the testator were only casual observers of the condition of his mind.

The proof shows that the provision of the will, in respect to the emancipation of Ned, was in accordance with a determination expressed by him for years before, and the act of revocation inconsistent with a previously fixed purpose. No witness proves that Wilcox ever expressed a desire to change the will, until Barnes brought it to him; and the manner in which Barnes obtained it from Summers, with whom it had been left for safe keeping, shows that it was through his influence that the whole matter was conducted. Barnes wrote the order for the will; it is shown to be in his hand-writing. After he had written it he presented it to Wilcox to get him to sign it. Whether he wrote his name, or whether his name was placed to the order by another, is doubtful. Wilcox told Barnes at the time that he did not know what he was doing. Barnes went after the will; brought it to Wilcox's; got Doctor Hill to present it to Wilcox, and called his mind to it. Gideon Barnes, one of defendants' witnesses, testifies that defendant Barnes on one occasion presented the will to Wilcox. He says Wilcox was only going to make a change in the will. The witness was not present when Barnes got Smith to present the will when the name was cut off. It is very clear that the whole thing was brought about by Barnes' importunity upon a mind that had lost its power of acting understandingly, and the will should not be treated as cancelled.

BARNES, &c.
vs.
EDWARD,
and
EDWARD
vs.
BARNES, &c.

Barnes having been privy to the pretended revocation of the will, and holding Ned in bondage, ought to pay him hire from the death of the testator.

*Grigsby & Newman* on the same side—

Ned filed this petition, asserting his freedom under the will of his late owner, Zera Wilcox, charging that by that will he had been emancipated, and that it had been suppressed by the defendants, Barnes and wife; the latter being the only child and heir-at-law of the testator Wilcox. He charges that Barnes and wife have the will in their possession, and they were required to file it, which they did.

It is in proof that Wilcox was not on friendly terms with Barnes, and had not been for several years. It is evident also that one leading object of the testator was to emancipate Ned, a favorite slave; also to make a provision for Eleanor Skeggs and a Miss Hall, and secure the balance of his estate to the children of his daughter, Mrs. Barnes, and keep it free from Barnes' control.

The proof is very clear that the will was deliberately made, signed, and witnessed, on the 1st day of July, 1850, and given to Summers to keep, and that the testator was in his proper mind. No dissatisfaction with its provisions was ever expressed by the testator. It had doubtless gone forth that Wilcox had made a will, and what were its provisions? Mrs. Barnes first visited her father and showed dissatisfaction. The old man tried to stand firm to his purposes, and done so. She spoke of leaving and sending her son, who was at enmity with his grand-father, at which the old man was greatly disturbed. Barnes, the defendant and son-in-law, was sent for. The testator told his daughter that he had made his will, and that he was well satisfied with it; and that he had given to her all that was in his house, and all in the kitchen. She showed dissatisfaction and left hurriedly. These facts furnish the clue to the

BARNES, &c.
vs.
EDWARD,
and
EDWARD
vs.
BARNES, &c.

understanding of what subsequently transpired.—
Wilcox was a man of will; he had never changed
his politics or his religion; he was at the time his
daughter left still firm in his purpose of adhering to
his will as made. This was between the 1st and
19th July, on which day Barnes got possession of the
will from Summers, under an order purporting to be
from Wilcox, which it is not shown that he ever sign-
ed, and the body of which is in Barnes' hand-writing.
No witness proves that Wilcox had ever become re-
conciled to Barnes. Gideon Barnes says he was pre-
sent on the 9th July, when the defendant, Barnes,
presented the will to Wilcox; which, however, was
ten days before the order was given to Summers to
send it, and while it was yet in possession of the
draftsman—a strange statement. Gideon Barnes
also says the old man said he wanted to change his
will. This might have been done without revoking
the emancipating clause, or the specific legacies to
Eleanor Skeggs and Mary Hall. But he did not re-
voke it whilst Gideon Barnes was there.

Doctor Hill, the attending physician, says Barnes
came to Wilcox's from two to four days before his
death; that Wilcox was then incapable of doing any
business—making a will or any other business, and
had been for ten days before his death; that Barnes
importuned him to present the will to Wilcox; to
arouse him and draw his attention to it; with diffi-
culty he did so. He asked Wilcox if he wanted to
do anything with it? He said not then. He let it
fall by his side, and it got under him, and it was
taken out soiled—and cleansed—his name was to it
then. This was from two to four days before his
death. He died in the last days of July, but which
day he cannot say. Witness left the will as origi-
nally made.

The next effort was with Walton Smith, who says
he gave Wilcox his will and a pair of scissors, and
he cut off his name, *and chewed and swallowed it;* that
he handed the will and scissors to Wilcox, at the re-

BARNES, &c.
vs.
EDWARD,
and
EDWARD
vs.
BARNES, &c.

quest of the defendant, Barnes; not at Wilcox's request. Wilcox had expressed to him no desire to change the will; had not sent for him; did not call on him or any one else to witness the act. Abell was at the door or on the step. What were the influences operating on the mind of Wilcox, and what was the deception practiced, will not perhaps ever be known. Whether it was that he was cancelling an obligation which he had paid off, or what else, is but conjecture, if indeed he knew what he was doing. This is said by these witnesses to have been a week, ten days, or two weeks before Wilcox's death, when Doctor Hill swears that the signature was to the will from two to four days before Wilcox's death.

Eleanor Skeggs says Wilcox was in a dying condition before the name was cut off the paper; that it was done in the morning before breakfast; she had gone to the spring, and on her return was informed of the fact; enquired of Wilcox; he denied that he had done anything with the will. She made the burying clothes the same day the name was cut off the paper.

Hall proves Wilcox was in a dying state the night before the paper was cut. These witnesses, with Robert Barnes, all show facts clearly demonstrating that if the name of Wilcox was then cut off the will, that he was clearly incompetent to revoke a will.

The court should have given hire from the death of Wilcox, instead of the filing of the bill, as the detention of Ned by Barnes was in bad faith, and with a full knowledge of his right to freedom.

Chief Justice CRENSHAW delivered the opinion of the court:

The instrument alledged to be the last will and testament of Zera Wilcox, deceased, was made in the county of Nelson, where he lived and died. After his death, this suit was brought by Edward in the *Larue* circuit court to establish his freedom, claimed

January 5.

BARNES, &c.
vs.
EDWARD,
and
EDWARD
vs.
BARNES, &c.

in virtue of said alleged last will and testament. The will had never been proved and recorded in the county of Nelson, which county, alone, had jurisdiction of its probate—it had never been proved and recorded in any county. And, without any probate of the will having been had, this suit was brought in the county of *Larue* to establish the plaintiff's right to freedom under the will. This could not be done until probate of the will in the proper county. *After* probate in the proper county, the suit for freedom might be brought in any county where the emancipated slave might be restrained of his liberty. But, the will must first be established, and that in the county of the residence of the testator. Until the will is established in the proper *forum,* no rights can be claimed or asserted under it.

1. The county court of the county of the residence of a testator alone has jurisdiction to hear proof of his will. (*Rev. Stat., sec.* 27.) Such was the law prior to the passage of the Revised Statutes.

The probate of wills has, in Kentucky, always been confined to the county of the testator's residence ; and the *Revised Statutes, page* 698, *section* 27, provides expressly that, "wills shall be proved before, and admitted to record by the county court of the county of the testator's residence."

No change has been made by the Revised Statutes as to the county in which the probate shall be made. The jurisdiction, before the adoption of the Revised Statutes, was local and is still local.

2. Courts of chancery have jurisdiction to establish wills which have been suppressed or destroyed, and the jurisdiction for that purpose belongs to the county where the will should be recorded. (*McCall vs. Vallandingham,* 9 *B. Mon.,* 550.)

Notwithstanding the county court of the county of a testator's residence is the only court pointed out by statute for the probate of his will; yet, it has not been doubted for many years *by any one,* so far as we know, that courts of chancery have jurisdiction to establish wills which have been destroyed or suppressed. Nevertheless, the jurisdiction being local, a suit in equity to establish a destroyed, or suppressed will, must be brought in the county of the testator's residence. Such is the doctrine deducible from the case of *McCall and wife vs. Vallandingham,* 9 *B. Mon.* 450. But, if it were even doubtful under our former system, whether any other circuit court than that of the county of the residence of a testator

might not take jurisdiction to establish a destroyed, or suppressed will, it is no longer doubtful under our present system of practice, but is put to rest by the Code. The Code of Practice requires that, "*an action* to establish or set aside a will, *must be brought in the county* in which the will, if valid, ought, according to law, to be recorded."

Now, according to the developments of the present record, the jurisdiction of a court of equity is unquestionable, but the jurisdiction must be exercised by the circuit court of the county of Nelson, which was the county of the testator's residence, and not by the circuit court of *Larue* county. The suit by Edward to establish his freedom, was, substantially, a suit to establish the will of his late master, without the establishment of which he cannot be declared free; and any proceeding to establish the will, must be had in the county of Nelson.

The court, however, had jurisdiction to enjoin the removal of Edward from the country, and the injunction to this effect was proper; and the court should retain the cause upon the docket, and continue to control and hire out the plaintiff, until a reasonably sufficient time shall elapse for the probate or establishment of the will in the proper county.

Wherefore, the judgment emancipating Edward is reversed for the want of jurisdiction in the Larue circuit court to establish the will, and the cause is remanded for the purpose herein indicated.