## Kaufman et al. v. Kaufman's Adm'r et al.

Dec. 8, 1942.

352

354

Allen P. Dodd, Jr., W. S. Heidenberg, Davis, Boehl, Viser & Marcus and Booth & Booth for appellants.

Gilbert Burnett and Davis W. Edwards for appellees.

OPINION OF THE COURT BY STANLEY, COMMISSIONER —Affiriming on direct and reversing on cross-appeal.

The principal question is the liability of an administrator and the sureties on his bond for the embezzlement of funds of the estate by an attorney to whom they were entrusted. A cross-appeal questions the time from which interest allowed in the judgment began and the power of the court to decree that it should bear 3% interest instead of the legal rate of 6%.

Upon the insistence of his brothers and sisters Henry Kaufman qualified as administrator of the estate of his recently deceased father, Peter Kaufman, in January, 1933. Kaufman is a farmer with little schooling or experience in financial matters and was reluctant to undertake the responsibility; but it was agreed that he should employ an attorney and some of the heirs suggested that the lawyer would attend to the business. The personal estate consisted principally of notes, many of which were secured by mortgages. Kaufman retained W. L. Doolan, Sr., as his attorney and placed in his hands the entire management of the estate. At that time Doolan was a highly respected and reputable lawyer. It is not contended that the administrator was negligent in retaining him as counselor. The National Surety Corporation was engaged by Doolan to become surety on Kaufman's bond in the sum of $10,000.

When Peter Kaufman's widow died eighteen months later, Henry Kaufman qualified as the administrator of her estate also, with the New Amsterdam Casualty Company as surety, in the sum of $1500. Her estate consisted of her distributable share of her husband's property.

In 1938 it was developed that Doolan had systematically embezzled the Kaufman and other estates and funds of his clients, and nothing was recoverable of him. Shortly before this discovery Doolan had filed a suit to settle the father's estate. It is believed now that this was done to obtain further time and avoid an earlier settlement required by the county court. When the situation had been developed, Kaufman employed other counsel and endeavored to salvage something. They filed an amended petition on July 31, 1938, consistent with the developments. Kaufman was removed in August and the estates placed in the hands of the public administrator. He intervened in the suit, brought in the two sureties and sought to recover the sums lost to both estates. In a clear and exhaustive manner the master commissioner by his deputy reported his findings of facts and recommendations. The chancellor adjudged a recovery as on a devastavit against Henry Kaufman in the sum of $12,162.63 with interest from the date of the judgment at the rate of 3% per annum. Judgment was also rendered against the National Surety Corporation for $10,000 and the New Amsterdam Casualty Company for $1,500, both being included in the judgment against their principal, Kaufman. They join in the prosecution of this appeal.

The honesty and good faith of the administrator is not questioned. His inexperience and reliance upon the dishonest lawyer is what got him into trouble. Kaufman kept no records or bank account as administrator, but turned everything over to Doolan, including collections he made himself. The attorney deposited the funds in his individual account and gave personal checks for disbursements, including some to the heirs. The administrator testified that he was kept busy during the time collecting rents, and supposed he had conferred with his lawyer on an average of once a week. Doolan advised there should be a joint control of the funds of the estate, but that he would take care of them. On one occasion Kaufman issued a check for $12.50, signed "Henry Kaufman, Administrator," in refund of interest paid by his sister to the estate, and it went through all right. It was developed in the trial that Doolan had given the bank his check for that sum, marked "for Kaufman check," and it was cleared with Doolan's check attached. He testified he issued a check for about $500 for his father's funeral expenses. It appears that Doolan simply

did not use that check but gave his own to cover the bill. Kaufman had no knowledge of these manipulations and supposed he could issue checks for the estate just as Doolan could, but he never made any inquiry about it. From time to time he and some of the others asked Doolan about a settlement and he gave some plausible excuse and said the money was drawing interest. Judge Gilbert Burnett, as attorney for one of the heirs, talked with Doolan several times over a period of three years before his exposure and was told that the estate was complicated, requiring the collection of a number of lien notes, which Judge Burnett realized did take time. He testified he and everyone else had confidence in Doolan and his investigation showed the administrator to have a sound surety and he so advised his client. Thus, Doolan lulled the administrator, the heirs, and the attorneys of one of them into inaction for five years.

It is not always easy to describe or discern the liability of executor or administrator or other fiduciary for loss resulting from the negligence or fault of agents or attorneys properly employed or retained by him. The question is essentially one of good faith and reasonable diligence. Where that appears, the acts are treated with indulgence. Mistaken judgment is not enough to impose liability. There is a vague distinction, in general, between the functions and duties of an executor or administrator and a trustee. Bogert on Trusts and Trustees, Sec. 12. But in relation to conditions like the present, there appears to be no distinction within the limitations of fiducial duties of a personal representative. Cf. Thompson v. Fraley, 279 Ky. 323, 130 S. W. (2d) 793. Those duties are to collect and distribute the estate among creditors and heirs in accordance with the statutes or will. The administration involves all that may be done rightfully in the collection and preservation of the assets and the management of the same, with that prudence and diligence which is observed in regard to private affairs by men of reasonable prudence and fair, average capacity. Barth v. Fidelity & Columbia Trust Co., 188 Ky. 788, 224 S. W. 351; Melheiser v. Central Trust Co. of Owensboro, 237 Ky. 757, 36 S. W. (2d) 377; Schouler on Wills, Executors and Administrators, Section 3362. For losses resulting from the failure to exercise that care the representative is personally liable. Schouler, Sections 2480, 2490. But this degree of prudence obviously calls for the exercise of administrative

discretion, which, in turn, often requires the use of agents and assistants, particularly in the performance of duties ·of a ministerial nature or of a type the executor or administrator could not reasonably be expected to perform personally. In the instant case there is no doubt that prudence and discretion required the employment of a lawyer as counselor, and, in respect to some of the assets, to his services as an attorney to collect and reduce the same to cash. And it is the generally accepted view that an administrator is not personally liable for loss through his lawyer's misconduct, negligence or nonfeasance if he exercised due prudence in the selection of the lawyer. 24 C. J. 126. But this necessary authority cannot extend to the surrender of all the duties of the trust or the delegation of all functions without becoming responsible to distributees for any loss sustained. Schouler, Section 2258; 24 C. J. 126. "The trustee is under a duty to the beneficiary not to delegate to others the doing of acts which the trustee can reasonably be required personally to perform. Thus, he cannot properly commit the entire administration of the trust to an agent or other person unless he is permitted to do so by the terms of the trust. Restatement of Law of Trusts, A. L. I., Sec. 171. If he does that without such permission and loss results he is responsible for it.

Under similar states of fact, it is generally held that an administrator permitting an attorney to retain for several years money of the estate collected by him without any effort to recover it from the attorney is liable for its loss to the estate. Note, 24 C. J. 126, citing Abercrombie v. Skinner, 42 Ala. 633; Reilly v. Porcher, 46 App. Div. 290, 61 N. Y. S. 662; Cheever v. Ellis, 134 Mich. 645, 96 N. W. 1067. See also In re Beer, Sur., 124 N. Y. S. 423; In re Chandler's Estate, ·136 Or. 128, 297 P. 841. It was held to be gross negligence, with consequent liability, in Re Estate of Skeer, 236 Pa. 404, 84 A. 787, 42 L. R. A., N. S., 170, for an administratrix to permit an attorney in fact to handle an estate for nine years without an accounting and settlement, during which time he misappropriated the funds. Presenting quite similar facts is our own case of McRoberts v. Carneal, 44 S. W. 442. In a suit to surcharge a settlement by an administrator with will annexed, in which gross negligence was alleged in the performance of his duties, his answer contained the plea that an attorney employed to represent him had collected money on nine or ten separate items

358

at various times during a period of four years and embezzled them. The attorney, when employed, was of good standing and reputation and had been the attorney for the decedent and some of the heirs. The court declared that these admissions of the answer implied gross negligence in the performance of the administrator's duties. Conceding the good faith and exercise of ordinary care in the employment of the lawyer, the court concluded that the demurrer to the answer was properly overruled and the administrator was liable because the fact that no effort to recover any of the sums for the estate was "convincing evidence of gross laches and negligence in the administration of the trust." It was held that the administrator should have known, if in fact he did not know, of the defalcation because during this time he permitted the attorney to remain in possession of the money and with the opportunity to misappropriate it later. The opinion was modified on a petition for rehearing and the case reversed only because of the feeling of the court that the facts alleged in the answer, which seemed to show such negligence, might be capable of explanation. Stewart's Adm'r v. Carneal, 51 S. W. 800.

In the case at bar the evidence fully developed the situation and disclosed facts which bring it fully within the rulings declared in the original opinion in the Carneal Case to constitute culpable negligence. As in that case, so it is here. The negligence is not confined simply to the act of employing the attorney to collect the notes but in permitting him to assume exclusive control and retain the proceeds and other funds and then by reason of the administrator's supine inaction apply the money to his own use. It is the administrator's course of conduct or the negative violation of his duty in remaining passive and in letting the attorney handle the funds of the estate, commingled with his own, as if they were his own property, and not requiring an accounting and settlement. While Kaufman was not familiar with his duties in respect to managing and settling the estate himself, and rested upon his confidence in the lawyer, he is to be judged by the standard of the average prudent and diligent man in handling his personal affairs. We cannot conceive of such man going along for five years without requiring an accounting from anyone. We concur in the chancellor's decision that the administrator did not, in the language of his bonds, "faithfully perform and dis-

charge all the duties" of his trust. The failure to make the accounting is the essential liability. The defense was properly adjudged insufficient.

The administrator and his sureties seek to escape liability upon the ground of estoppel of the heirs except one who lived in Detroit and an infant grandchild of the decedents. It is not necessary to decide the point made in opposition that the administrator de bonis non cannot be estopped from maintaining the suit by any act of the heirs. The plea of estoppel is rested upon acquiescence, in that the heirs had consented to Doolan's employment and knew all the time he was handling and commingling the funds of the estate with his own and they had done nothing about it. We pass over the matter of agreeing to the attorney's employment for, as already said, there was no culpability in that. All the heirs, save the non-resident and child, were farmers, living in the same neighborhood and frequently had family gatherings. It is probable, as the commissioner reported, that the status of the estate was often discussed. The heirs from time to time received checks signed by Doolan alone in payment of services or as small advancements. There is persuasive testimony that some of them knew that Doolan was not only directly making collections but was receiving money the administrator personally collected. When their mother died they agreed that Henry should obtain the estate's money "from Doolan" and pay for flowers. Henry testified he thought he had joint control of the estate with Doolan, which was sustained by the fact that he had issued the two checks we have described. And if he did not realize that the attorney had exclusive control, it is hardly conceivable, as said in brief, that the other heirs knew it. It is not suggested that the administrator knew that Doolan was systematically dissipating the estate. Everyone during this period seemed to have had confidence in him, although one of the heirs testified he did not trust him and perhaps questioned Henry about the situation.

The question arises, wherein were any rights of the heirs lost by their knowledge and inaction? There is nothing to show that the administrator was misled or failed to take action by their mere knowledge of the situation. Of course, they had the privilege of demanding a settlement of the estate at the end of two years, Section 3858, Ky. Stats., but that does not affect their right

to have a proper accounting now. A beneficiary's waiver of his right to object to a breach of trust does not enlarge the powers of a trustee. Pomeroy, Section 1083; Scott on Trusts, Section 1083. They had the right to rely upon the administrator's obligation and bond. Suppose the heirs had said to him, "We object to your letting the attorney manage the estate and hold the money and demand that it be stopped." Could he not have reasonably responded that when required he would make a complete and proper settlement and accounting and that he had a good bond to assure it? There was no completed default until he failed to make the accounting. As stated in Wisdom's Adm'r v. Sims, 284 Ky. 258, 144 S. W. (2d) 232, 236:

> "Silence, or failure to act in order to work estoppel, must be bad faith silence or failure. Shaw v. Farmers' Bank & Trust Co., 235 Ky. 502, 31 S. W. (2d) 893. * * * Remaining passive does not ordinarily deprive one of his legal rights, unless in addition thereto he does some act to induce or encourage another to alter his condition, and by reason thereof it becomes unconscionable to award the claimed rights. Embry v. Long, 256 Ky. 266, 75 S. W. (2d) 1036."

We think it will be found that the rule of estoppel by acquiescence in the matter of settlement of an estate has been applied to a completed or executed transaction or to an act substantially affecting an innocent third party and never to a negligent course of conduct in the execution of the trust for the benefit of the party sought to be estopped, except under certain circumstances where an executor or administrator continued to carry on his decedent's business or made improper investments with the full knowledge and consent of the devisees or heirs.

As to the sureties, it is quite strange that they let the settlement of the estate drag along for five years without taking notice of the situation. The heirs were under no duty to inform the sureties of it or of any other mismanagement by the administrator. Unlike an employer to whom a surety bond of an employee has been executed, there is no duty upon the beneficiaries of a trust to give notice of previous default by the trustee. In the case of an employer-employee relationship, the employer is the master of the situation and can put an end to

his services at the moment he discovers his employee's unfaithfulness. If he does not, knowing that the surety is shut up to this single source of information, the law will not permit him to reap any advantage from his concealment or misrepresentation. In State v. Howarth, 48 Conn. 207, the surety on the bond of a testamentary trustee sought escape from liability for his misappropriation on the ground that the beneficiaries knew he was holding funds in his hands instead of investing them and thereby had opportunity to misappropriate them. The court, after making the distinction between an employer-employee relationship and that involved in the case, as above outlined, pertinently said:

"The surety, always, of course, has both the ability and the opportunity to decide for himself the extent of the risk assumed; and it is only by force of his self-imposed burden that the trustee is enabled to obtain possession of the fund. Upon him rests the duty of enquiry as to the character and acts of his principal; he is to be diligent in his own protection; he is to discover for himself the earliest indications of fault or fraud. It is not his privilege to abstain from all enquiry and cast upon the cestui que trust the loss resulting from his voluntary ignorance.

"The cestui que trust is under no obligation to determine for him what acts or investments on the part of his principal may or may not put him in peril; is not bound to institute or continue legal proceedings for his protection; not bound either to obtain information for his benefit, or to provide against or foresee possible loss to him. The purpose of the statute is to compel the surety to insure the cestui que trust, not that the latter shall defend him."

So it is in the present case. There was no duty to speak. We are of opinion, therefore, that the court properly ruled the heirs were not estopped to maintain the action against the administrator and his sureties.

As already stated, about a year after the death of his father, Henry Kaufman also qualified as administrator of the estate of his mother, Mrs. Susie Kaufman, with the New Amsterdam Casualty Company as surety on his bond in the sum of $1500. No money ever actual-

ly came into the hands of Kaufman as her administrator, but there did constructively. He should have paid himself in that capacity her distributable share in her husband's estate. After he had qualified as her administrator Kaufman collected about $5300 on behalf of his father's estate. We agree with the chancellor that he should have reduced at least half of this into possession as administrator of his mother. Liability for the loss to the estate may be placed upon the simple ground of his failure and negligence in not collecting the same. Scarborough v. Watkins, 48 Ky. 540, 9 B. Mon. 540, 50 Am. Dec. 528; May v. Walter's Ex'rs, 149 Ky. 749, 149 S. W. 1014. The master commissioner did not undertake to report the amount of the mother's estate other than to disclose that it was greatly in excess of $1500, the amount of the administrator's bond. As her legatees are the same as her husband's, the additional amount seems immaterial, for the added liability of the two sureties does not equal that of their principal.

After Doolan's misappropriation was discovered in March, 1938, Messrs. Dodd & Dodd and Wm. S. Heidenberg were employed by the administrator as attorneys for the estate. They made considerable investigation of the complicated situation and filed an amended petition in the suit previously filed by Doolan and sought to straighten out the tangled affairs and to recover something of the defaulting attorney. His insolvency was not then apparent and it was believed something might be recovered. These attorneys represented Kaufman as administrator until his removal in August. Before the conclusion of the case, Kaufman moved the court to make him an allowance out of the estate with which to compensate these attorneys for those services, but it was overruled. While nothing was recovered by them, the services were rendered the estate and doubtless were beneficial to the administrator de bonis non and his counsel. We are of opinion that the court should have made a reasonable allowance for the services of the attorneys measured by the usual criterion. Oster's Ex'r v. Ohlman, 187 Ky. 341, 219 S. W. 187; 24 C. J. 98.

On the cross-appeal it is maintained the court should have allowed interest against the defendants from the date the suit to recover was instituted, December 12, 1938, instead of the date of the judgment, May 2, 1941, and at the rate of 6% instead of 3% per annum.

On the first point: In Fidelity & Deposit Co. of Maryland v. Husbands, 174 Ky. 200, 192 S. W. 51, in an action against an assignee and his sureties, it was held judgment should have been for interest from the filing of the petition; but in Fidelity & Casualty Co. of New York v. Downey, 284 Ky. 72, 143 S. W. (2d) 869, in a similar action against a committee for an insane person and his sureties, it was held proper to adjudge interest from the date of the entry of the judgment since it was on an unliquidated claim and the allowance of interest on such lies in the discretion of the court or jury trying the case, and particularly since the liability of the surety was limited to the amount of the bond for all of which the judgment went. The allowance of interest from the entry of the judgment in such cases is the general rule, for there must be a fixed and determinate amount which could have been tendered and interest thereby stopped, and that cannot be done where the claim is wholly denied in good faith or where the amount of the demand is disputed on reasonable grounds. 33 C. J. 211, 212. In the Husbands case the judgment was not for the full penal sum of the bond; but that fact does not seem material. Carter v. Thorn, 57 Ky. 613, 18 B. Mon. 613; Waddle v. Wilson, 164 Ky. 228, 175 S. W. 382; 50 C. J. 90. We adhere to the decision in the Downey case and overrule the Husbands case to the extent of the conflict.

When the judgment was rendered, the statutes provided "A judgment shall bear legal interest from its date" (Sec. 2220, Ky. Stats.), and the legal rate is 6% per annum. Section 2218, Ky. Statutes. The chancellor took judicial notice that interest rates in the commercial world had greatly decreased and even 2% was regarded as a good yield on an investment. He construed the statute, Section 2220, as expressing the legislative intent to limit interest on judgments to a maximum of 6% and to make a less rate legal interest, and regarded it "inequitable that court obligations should carry a rate of interest altogether out of proportion to the earning of money generally." It may be noted that at the next session of the legislature the statute was amended to provide, "that when a claim for unliquidated damages is reduced to judgment, such judgment may bear less interest than six percent if the court rendering such judgment, after a hearing on that question, is satisfied that the rate of interest should be less than six percent." (KRS 360.040; Ch. 99, Acts of 1942).

The statute is too plain and definite, we think, to afford the interpretation that it but declares a maximum rate of interest. Whatever may have been the power of a court of equity in ancient days, the later incorporation in equity and common law systems of characteristics and principles of the other has led to the abandonment of most of the old technicalities and distinctions in the administration of justice. But there has always been the familiar maxim, "Equity follows the law." As stated in Pomeroy, Sec. 425:

"Courts of equity may no more disregard statutory and constitutional requirements and provisions than can courts of law. They are bound by positive provisions of a statute equally with courts of law. . . . Wherever the rights of the parties are clearly governed by rules of law, courts of equity will follow such legal rules."

Of like declaration is 19 Am. Jur., Equity, Sections 10, 454. Although the judgment in this particular seems fair and just under existing conditions, economically speaking, we are constrained to hold the chancellor was without authority to provide other than that the judgment should bear 6% interest.

On the direct appeal, the judgment is affirmed except as to the failure to make an allowance for compensating the former administrator's attorneys. On the cross-appeal, it is affirmed except in respect to the rate of interest it should bear.

Whole court sitting.