518 F.2d 246
 In the Matter of Roy M. JOHNSON, Debtor.
Otey JOHNSON, Individually and as Trustee, et al., Appellants,
v.
Gordon D. CLARK et al., Appellees.
The FIRST NATIONAL BANK AND TRUST COMPANY OF MUSKOGEE
(Trustee in Succession ofthe Roy M. Johnson
Trust), Appellant,
v.
Gordon D. CLARK et al., Appellees.
 Nos. 74-1373, 74-1374.
 United States Court of Appeals,
Tenth Circuit.
 Argued March 25, 1975.
Decided May 29, 1975.
Rehearing Denied June 19, 1975.
 
 Andrew Wilcoxen, of Wilcoxen, Lunn, Mayes & Cate, Muskogee, Okl., for appellants Johnson and others.
 A. Carl Robinson, of Robinson, Summers & Locke, Muskogee, Okl., for appellant The First Natl. Bank and Trust Co. of Muskogee, Trustee in Succession.
 J. D. DeBois, of DeBois, Peck & Sherrill, Duncan, Okl., and Henry W. Simon, Sr., of Simon & Simon, Fort Worth, Tex. (O. L. Peck, Jr. of DeBois, Peck & Sherrill, Duncan, Okl., and John W. Hughes of Simon & Simon, Fort Worth, Tex., on the brief), for appellee Gordon D. Clark.
 Before LEWIS, Chief Judge, and BREITENSTEIN and DOYLE, Circuit Judges.
 DOYLE, Circuit Judge.
 
 
 1
 The main issue presented is whether the trustee of a creditors trust established pursuant to Chapter XII of the Bankruptcy Act is to be surcharged for substantial losses to the trust, which losses resulted from defalcations of the bookkeeper; the losses amounted to about $50,000 and occurred during a period starting in 1960 and continuing to 1969.
 
 
 2
 Appellee Clark was the trustee who hired Billingsley, the bookkeeper. The latter received all of the income of the trust and had absolute control over all expenditures. Notwithstanding that the embezzlements and the fraudulent peculations were regularly carried out, the trustee failed to check on the bookkeeper's work and never discovered the losses. Finally, accountants, while preparing income tax returns, accidentally became aware of the wrongdoing.
 
 
 3
 In an action by the beneficiaries seeking to surcharge the trustee for the deficiencies in his accounts, the trial court denied relief. The beneficiaries and creditors have appealed.
 
 
 4
 Following the filing of a petition for a Chapter XII arrangement by Roy Johnson on August 5, 1958, the United States District Court for the Eastern District of Oklahoma approved the proposed arrangement and confirmed the same on May 11, 1960. At that time, Clark was appointed trustee. The arrangement required the trustee to continue the business, submit a profit and loss statement each month, pay the income from mortgaged property to secured creditors and to pay the remaining income to the unsecured creditors. In 1961 the court ordered the trustee to submit annual audits to the court and creditors. In practice these did not involve a detailed investigation and did not reveal the facts.
 
 
 5
 As of November 1962, the working interests of the trust had been sold, the secured creditors had been paid and the trust retained only passive royalty interests. Distributions to the unsecured creditors were made on July 31, 1962, August 15, 1962, September 11, 1963 and July 31, 1968. The resulting reduction of debt amounted to approximately 30%.
 
 
 6
 Besides being trustee Clark, who was a geologist, operated his own business and a partnership with his father. All were conducted in the same office. Billingsley, the embezzling bookkeeper and the secretary, performed services for all three businesses.
 
 
 7
 The undisputed evidence showed that Clark filed the monthly statements and the annual reports, sending copies to the creditors. However, no hearings were ever held on the sufficiency of these nor was action taken by the court giving approval to them. At the same time, neither the creditors nor the residuary beneficiaries objected.
 
 
 8
 The annual reports were unaudited. They were prepared by the accountants from figures given by Billingsley. It was not until 1969 that these accountants discovered some discrepancy leading to further investigation and revelation that Billingsley had been embezzling money of the trust from its inception. He had both altered and forged checks on a regular basis. For example, not infrequently he raised his salary checks by $1,000. His other practice was to convert royalty checks payable to the trust. He would endorse them on behalf of the trust and then make deposits in his personal account. All of these defalcations totaled over $50,000.
 
 
 9
 After discovery of the wrongdoing, Clark dismissed Billingsley, enjoined him from disposing of his property and proceeded to get a judgment against him. After this, Billingsley's assets were sold and the proceeds were deposited in court. The trustee also obtained permission to sue the Exchange National Bank and Trust Company of Ardmore.[1] This was the bank which had received trust checks deposited in the account of Billingsley.
 
 
 10
 The trust had been intended at the time of its creation to continue for 10 years. Therefore, on April 28, 1970, the trustee sought an extension of time in order to pursue the Billingsley recovery. In conjunction with this, however, he requested an order allowing liquidation of the assets and termination of the trust. The beneficiaries and some of the creditors objected to this. As a result a hearing was held in October in which the court directed the trustee to file a preliminary final accounting. Soon thereafter, in January 1971, the objecting creditors and beneficiaries applied to the court to surcharge the trustee for the deficiencies attributable to Billingsley and also for alleged excessive administrative expenses. In addition, a request was made that the trustee be denied the additional compensation which the plan would have given to him.[2]
 
 
 11
 Following another hearing in February the court continued the arrangement for a year. The court also ordered Clark to file a final report. Delay of the surcharge determination was also ordered.
 
 
 12
 On March 1, 1971, the First National Bank and Trust Company of Muskogee succeeded Clark as trustee, and as the plaintiff in the suit against the Exchange National Bank. At the trial of this matter in February 1972 the trustee Bank prevailed.
 
 
 13
 A hearing on Clark's final report and motion for discharge was held in August 1971. After that, the case was taken under advisement, and on November 21, 1972, Judge Langley entered an order surcharging Clark in the amount of $157,185.99. However, on January 2, 1973, this order of surcharge was vacated. Another hearing was held on April 24. Following this briefs were submitted, but before a decision could be made Judge Langley died. The case was then tried by Judge Daugherty on the record. This trial was held on April 19, 1974, at which time oral arguments were made, and soon thereafter, on May 3, 1974, Judge Daugherty entered the present order which is now being reviewed in which he denied the surcharge and approved the final account of Clark.
 
 The trial court ruled:
 
 14
 1) That the judgment allowing the estate to recover against the Exchange National Bank somehow barred or prevented a surcharge in these proceedings. The court's reasoning was that the creditors and beneficiaries were barred from asserting a position inconsistent with that maintained in the prior proceeding;
 
 
 15
 2) The court was uncertain as to whether a reasonably prudent person could have detected Billingsley's conversions;
 
 
 16
 3) The court refused to surcharge for excessive administrative costs on the ground that it felt unable to conclude improper management by Clark warranting surcharge;
 
 
 17
 4) The court felt that the objectors were barred because of their failure to object to the reports which were filed regularly. The ruling was that they had either ratified or acquiesced;
 
 
 18
 5) The beneficiaries and creditors were barred by laches. They had not objected and thus it would be unfair to surcharge the trustee after passage of the years involved;
 
 
 19
 6) The court held that the misuse of the telephone and the making of gifts out of trust funds was de minimis;
 
 
 20
 7) The accounting expenses and legal expenses occasioned by the substantial losses to the trust were not chargeable under the totality of the facts; finally, the crowning blow was the court's ruling that the trustee was entitled to his 15% of the residue of the estate. All of these rulings are challenged on this appeal.
 
 I.
 
 21
 The standard applicable to the surcharge of a bankruptcy trustee is negligence. This was established in the case of Mosser v. Darrow, 341 U.S. 267, 71 S.Ct. 680, 95 L.Ed. 927 (1951). As in the case at bar, the trustee there did not make any personal profit. His wrongdoing consisted of allowing key employees to profit personally by trading in securities of the subsidiaries of the debtor corporation. Darrow was appointed reorganization trustee in 1935 for the common law trusts. Johnson and Kulp were employed by the trustee. They had been promoters of the subsidiaries of the common law trusts which were being reorganized. Their employment agreement allowed them to trade in securities of the subsidiaries. They would often acquire bonds and then sell them at a profit to the trustee, and in some instances they had purchased bonds from people who had intended to offer them to the trustee for purchase. During eight years of trusteeship Darrow filed but one account for one of the debtors. Following an SEC investigation, Darrow resigned and filed his final account which was objected to. The Supreme Court pointed out that the reorganization trustee is a representative of the court. The trusteeship, the Court said, is "serious business and is not to be undertaken lightly." The Court further said that the doing of forbidden acts calls for the sanction of personal liability. The Supreme Court further said that the responsibility could have been avoided if the questionable practice had been submitted to the court for its approval, in which case a notice would have been given to creditors and interested parties or by making reports at regular intervals (in this instance the trustee failed to report). Thus, this case shows the general ground rules.
 
 
 22
 Other decisions illustrate instances in which the trustee has been surcharged. Thus, the trustee was surcharged where he failed to pay a priority claim for wages and at the same time exhausted the estate in paying general creditors. In re B. A. Montgomery & Son, 17 F.2d 404 (N.D.Ohio 1927).[3]
 
 
 23
 It has been held that the trustee as an officer of the court is responsible for wrongful conduct and is accountable to the court. Chappel v. First Trust Co. of Appleton, Wisconsin, 30 F.Supp. 765 (E.D.Wis.1940).[4]
 
 
 24
 Generally, the standard is the exercise of due care, diligence and skill both as to affirmative and negative conduct. Where the trustee is negligent or willful and fails to meet the standard of care required of him, he is liable for loss. The standard or measure of care, diligence and skill is that of an ordinarily prudent man in the conduct of his private affairs under similar circumstances and with a similar object in view. It is not necessary to a surcharge of a trustee's accounts that he shall have been guilty of fraud or intentional wrongdoing. It is sufficient that the trustee has failed to discharge a duty required by the law. See 76 Am.Jur.2d Trusts §§ 325, 326 and 510.[5]
 
 
 25
 No two cases in this area are alike on their facts, but there exists a similarity between this case and Mosser v. Darrow, supra. There the trustee failed over a period of time to file reports. At bar there was a failure to check on the malfeasance of the bookkeeper-secretary. The result in Mosser was that the employees made profits from trading in securities and were guilty of a conflict of interest. This, of course, was done with the knowledge of the trustee, but as we view it liability is not to be avoided by the expedient of not examining the records. The trustee was under a duty to the court and to the beneficiaries and creditors to ascertain the facts. As we view it, he could not discharge his duty of reasonable care by allowing the bookkeeper to have a free hand over a long period of time.
 
 II.
 
 26
 In our opinion the trial court erred in holding that the successor trustee and the creditors and beneficiaries were barred by the doctrine of judicial estoppel or collateral estoppel in claiming that Clark was negligent. It is true that Clark's alleged negligence was an issue in the state case against the Exchange National Bank. However, the negligence of Clark was not directly involved. The court instructed the jury that recovery could be had if the bank knew or should have known that deposits of items made out to the trust were placed in the personal account of Billingsley. Examination of the instructions fails to reveal that the jury was told that it could only find for the plaintiff if the fraud could not have been discovered with reasonable diligence.
 
 
 27
 Under the doctrine of judicial estoppel a party and his privies who have knowingly and deliberately assumed a particular position are estopped from assuming an inconsistent position to the prejudice of the adverse party. This rule ordinarily applies to inconsistent positions assumed in the course of the same judicial proceeding or in subsequent proceedings involving identical parties and questions. See 31 C.J.S. Estoppel §§ 117, 118 and 119.
 
 
 28
 We are of the opinion that the subject matter in the bank case and the present case are essentially dissimilar. The relationships between the beneficiaries and creditors and the trustee are wholly different from the relationship between the trustee and the Exchange National Bank. Assuming that the trustee was not guilty of contributory negligence in relationship to the bank, this fails to establish that the trustee was free of negligence in relationship to the beneficiaries and creditors for the simple reason that the relationship between the trustee and the bank is an arm's length one and this affects the standard of care owed. Moreover, the bank is in a far superior position to discover the wrongdoing. Its conduct could well have been classified as wanton. In the case at bar, however, the obligation to detect misconduct and wrongdoing was on Clark, and in this instance he was in a position to discover it so as to prevent injury to the trust. The beneficiaries and creditors are no more barred by the judgment in the Oklahoma suit than the district court would be barred from surcharging the trustee.
 
 
 29
 We have examined the cases submitted by Clark. In Magnolia Petroleum Co. v. Ouart, 200 Okl. 258, 192 P.2d 698 (1947), Magnolia was held to be estopped from maintaining an inconsistent position in a second suit between the same parties. In one case Magnolia had taken the position that there was a lease, whereas in the second case they took the position that there was not a lease. The Ouarts had changed their position in the first case in reliance on Magnolia's claim that a valid lease existed.
 
 
 30
 The doctrine of collateral estoppel requires that an essential element of one claim has been litigated previously and determined by a valid judgment. See Restatement of Judgments § 68 (1942). Here again the issues must be the same just as with judicial estoppel and the parties must be the same. Assuming that the parties were the same, it cannot be said that the identical issue was litigated and determined here.
 
 
 31
 The reliance on Anco Mfg. & Supply Co. v. Swank, 524 P.2d 7 (Okl.1974) and Lewis v. Aubrey, 404 P.2d 1005 (Okl.1965) is not correctly taken. In Anco the plaintiff attempted to maintain a position directly contrary to that taken by her in a former case against a different defendant. In Lewis, there was substantial identity of parties and the plaintiffs attempted to relitigate an issue already determined in a prior case.
 
 
 32
 Appellants contend that collateral estoppel cannot apply because of the different roles of the trustee in the two cases. In the case against the Exchange National Bank, Clark appeared in his representative capacity. Here he is defending a personal surcharge and is thus giving an account of his stewardship. See Hartford National Bank & Trust Co. v. Malcolm-Smith, 129 Conn. 67, 26 A.2d 234 (1942) and Restatement of Judgments § 80(a), § 85, comment (n).
 
 
 33
 It seems clear to us that the different roles which Clark was occupying in the two suits preclude him from utilizing either collateral or judicial estoppel against the creditors and beneficiaries. Also, Clark has made no showing that he was harmed and there was no way for the beneficiaries to protect themselves against this present assertion since they did not make any decisions. Indeed they consistently maintained throughout the arrangement proceeding that Clark had violated his duties to the trust. The judgment in the state court did not prejudice Clark. Rather, it helped his position by reducing the amount of his liability. Secondly, the issues in the two actions are not, as we have indicated, the same because as we have pointed out before the relationship was different. For example, the failure of Clark to bond Billingsley was not and could not have been presented in the bank case, but above all, as we have indicated previously, the duty toward the beneficiaries of a trust is different than toward a third party and the trustee may not delegate to others duties which he is personally responsible for. See Restatement of Trusts 2d § 171 (1959). This issue of improper delegation was not present in the state case and this arises, of course, from the existence of the fiduciary relationship and the duties incident thereto.
 
 
 34
 We are mindful that the district court did not find that the trustee was not negligent in failing to require Billingsley to be bonded or in allowing him to handle all the financial matters of the trust.[6] There was at least some evidence that Clark had notice in 1965 that all might not be "A-1" in Billingsley's handling of the trust.[7] The trial court did not, however, come to grips with this issue. It merely found that a prudent person would not have discovered Billingsley's embezzlement, but there was no finding that the trustee acted properly in allowing Billingsley to have a free hand in the operation of a trust that Clark was obligated to perform. We see no evidence to support the court's conclusion that a prudent person would not have discovered Billingsley's embezzlement. The answer is that a prudent person having the duties that Clark had in respect to this trust should have discovered it and so also he should have been surcharged.
 
 
 35
 It was held also that certain other expenditures for telephone and gifts, although perhaps not proper, were de minimis. With respect to this, the court appeared to place the burden of proving the impropriety of the expenditures on the appellants, but the burden was on the trustee to justify his account and to show the propriety of his expenditure. Davis v. Jones,254 F.2d 696 (10th Cir.), cert. denied, 358 U.S. 865, 79 S.Ct. 97, 3 L.Ed.2d 98 (1958); Chisholm v. House, 183 F.2d 698 (10th Cir. 1950). While it is true that Clark may have acted properly in hiring a bookkeeper and secretary, that does not necessarily justify the amount of salaries paid or the health insurance premiums paid. Clark was not engaged in merely running a business, he was a court-appointed trustee and thus was subject to court supervision. The telephone costs in question amounted to over $11,000 from August 1, 1958 to February 28, 1971. Clark used the telephone for his own businesses although they were not listed. An accountant testified that some part of the base rate ought not to have been paid by the trust but, rather, by Clark personally. If the chargeable base rates were, for example, $10 per month, the amount recoverable would have been $1,200. This is not de minimis. Clark also spent more than $400 for publications which were used for reading material for people who came into the office.
 
 
 36
 These were not scrutinized in detail by the court and had they been it is doubtful that they would have been treated as de minimis.
 
 III.
 
 37
 Was the trial court correct in holding that appellants had either ratified or acquiesced in the operation of the trust or were barred by laches from challenging the reasonableness of the administrative expenses?
 
 
 38
 The demand for disapproval of Clark's submission of accounts and for surcharge was filed on January 21, 1971. There is no evidence of either words or conduct constituting an express ratification of the operation. The trustee relies on the decision of the District Court for the District of Massachusetts in In re Cook, 28 F.2d 521 (D.Mass.1928), where the referee had ordered appraisal of certain real estate and had thereafter fixed the compensation of the appraisers without giving notice to the creditors or the representatives of the bankrupt. The amount was paid by the trustee after the referee had declared a 100% dividend and had specifically authorized the appraisers' fees. Some 10 months later, when the trustee filed his final report and account, the administrator of the bankrupt objected to the allowance of the appraisers' fees. The court held that these items were not open to objection in view of the procedures which had been taken. Clark is apparently seeking a ruling that all of the items that were included in his annual reports are protected, but none of the payments made for expenses incurred were specifically authorized by the court and none of the annual reports were approved by the court. Furthermore, no notice was given and no hearing was held. An additional factor is that the reports were so sketchy that they did not give effective notice.
 
 
 39
 Ratification requires knowledge. See Davis v. Jones, 254 F.2d 696 (10th Cir.), cert. denied, 358 U.S. 865, 79 S.Ct. 97, 3 L.Ed.2d 98 (1958); Chisholm v. House, 183 F.2d 698 (10th Cir. 1950); Earll v. Picken, 72 App.D.C. 91, 113 F.2d 150 (1940); Restatement of Trusts 2d §§ 216-218. True, the annual report showed the total spent in various categories such as insurance, salaries, rent, telephone, but there was no indication that the insurance money was not for trust property but for health and hospital insurance on the secretary and bookkeeper, nor did the reports show that the telephone bills included unauthorized calls and use for purposes other than the trust, nor did they reflect amounts paid to Billingsley, the bookkeeper. There can be no ratification by failure to make investigation and in effect the trial court did place the burden on the beneficiaries to investigate. Instead, the trustee has a duty to make a full disclosure. See Restatement of Trusts 2d § 172 and, particularly, § 173.
 
 
 40
 The position that the beneficiaries and creditors are barred by laches is equally non-meritorious because this could be true only if the beneficiary had postponed suit for an inordinate length of time, whereby it would be inequitable to allow him to proceed. Restatement of Trusts 2d § 219(1). See also Chisholm v. House, supra, at 705. Where, as here, the beneficiary has not been aware of the trustee's misfeasance, the doctrine of laches does not come into play. See Chisholm v. House, supra ; Earll v. Picken, supra ; Restatement of Trusts 2d § 219, comment (c).
 
 
 41
 The Restatement of Trusts 2d § 219, comment (a) lists ten different standards to be considered in determining applicability of laches.[8]
 
 
 42
 The attempted surcharges involve occurrences during the entire period of the trustee's tenure. There was no reason to know that the trustee had left the entire financial administration of the estate to the bookkeeper nor did the appellants have reason to know of the impropriety of the totals spent in various categories, so we see no reason for barring appellants from pursuing their claims; the appraisal of the equities does not call for it. The preliminary final account was filed December 17, 1970, and the application for surcharge was filed January 21, 1971, so once appellants were apprised of the facts they did not delay.
 
 
 43
 In view of the circumstances of this case, then, the trial court's determination that it would be unfair to charge the trustee at this late date cannot be sustained. It is not shown that any changes have occurred due to the delay, but even so a transcript of what happened exists and problems such as lost witnesses can be resolved by using the transcript as the trial court did in the case at bar. It is the beneficiaries who are suffering hardship by the trial court's decree because they are prevented from recovering money which should not have been paid in the first place. On balance, then, the equities are overwhelmingly on the side of the appellants and, therefore, laches cannot operate.
 
 IV.
 
 44
 A. Lawyers Fees, Costs and Expenses.
 
 
 45
 We finally consider whether the trial court was correct in allowing attorneys' fees in the proceedings of Clark against Billingsley in the amount of $6,000 (incurred after the defalcations came to light) and, secondly, allowing $24,000 for services in the state court proceedings against Exchange National, and $1,517.42 for costs and expenses in the two proceedings.
 
 
 46
 In contending that the court erred in charging the trust with these expenses, appellants maintain that inasmuch as these outlays were necessitated by the negligence of the trustee Clark, that the trust should not have to bear this expense; that it should be charged to Clark. They cite a comment in 90 C.J.S. Trusts § 276, which generally supports their thesis.
 
 
 47
 The action of Clark was not merely a matter of error in judgment. If it were he could not be held responsible. Cf. Crews v. Willis, 195 Okl. 475, 159 P.2d 251 (1945). It is true that the trust should defer such charges of an attorney who is working on behalf of the estate. See In re Kenin's Trust Estate, 343 Pa. 549, 23 A.2d 837 (1942); 90 C.J.S. Trusts § 284, p. 401. This does not, however, say that the trustee should not be required to indemnify the trust estate where he is ultimately responsible to the trust.
 
 
 48
 The court took the same view as to expenses incident to the surcharge and final account hearing. The rule with respect to this is that a trustee who unsuccessfully defends charges of maladministration resulting in a surcharge is not entitled to be paid for his costs from the trust estate and may be required to pay the costs of the beneficiaries. See Crutcher v. Joyce, 146 F.2d 518 (10th Cir. 1945); 76 Am.Jur.2d Trusts § 533; 90 C.J.S. Trusts § 284, pp. 409-410. It would now be less objectionable if the trial court had recognized that the negligence of Clark was the cause of the trust's being saddled with these expenses. On remand, therefore, the matter should be reviewed and reconsidered in light of the view that this court takes of the law of the case.
 
 
 49
 B. Trustee's Compensation.
 
 
 50
 The trial court allowed trustee Clark 15% of the residue of the corpus of the estate after all creditors were paid. Appellants had demanded that the court compel Clark to forfeit this additional compensation which was provided in the arrangement. This compensation was in addition to the $500 per month paid to Clark throughout the administration of the trust. The arrangement contains no provision for reduction of the 15% interest on termination of the trust. The award of this compensation was at least consistent with the trial court's viewpoint that no surcharge was called for. The matter takes on a different flavor when the opposite result is reached on surcharge.
 
 
 51
 Whether a trustee who has committed a breach of trust is to be denied compensation in whole or in part is discretionary with the court. Restatement of Trusts 2d § 243, comment (a). Thus, the Bankruptcy Court is empowered to avoid paying the trustee more than his performance requires. Restatement, supra, § 243, comment (a). The trial court admitted that the operation of the trust was not "ideal." This matter must also be reconsidered by the trial court in the light of this court's determination that surcharge of the trustee was necessary.
 
 
 52
 Finally, we view this as a clear case of misfeasance on the part of the trustee, since the evidence establishing it, although circumstantial, is strong. We are not here dealing with an isolated criminal incident by the bookkeeper but, rather, a repeated and continuous faithlessness and criminality over a long period of time. The trustee whose inactivity allowed this to happen cannot consistent with his fiduciary obligations be heard to say that he did not anticipate the misconduct or that the beneficiaries were themselves at fault for not having discovered the wrongdoing and called it to his attention.
 
 
 53
 Accordingly, the cause is remanded with directions to the trial court to vacate its judgment in whole and render a new judgment surcharging the trustee for the losses suffered as a direct result of the misconduct of Billingsley. The court is directed to reconsider the attorney's fees and costs and expense items as well as the extra compensation items in the light of this court's decision, and enter appropriate judgments consistent with the views expressed herein.
 
 
 
 [1]
 Both the trust account and Billingsley's account were kept with the Exchange National Bank. Billingsley would endorse the checks properly, but then simply deposit them in his personal account
 
 
 [2]
 The arrangement provided that when the trust was terminated and all the creditors were paid, Clark would be entitled to 15% of the residue
 
 
 [3]
 In that case the court said:
 It has been repeatedly held that trustees in bankruptcy, like executors and administrators, are bound to exercise due diligence, and that, if loss or damage results from failure so to do, their reports and accounts may be surcharged. (p. 406)
 
 
 [4]
 The court in that case said:
 A trustee in bankruptcy is an officer of the court which appoints him. If his conduct is wrongful as to the assets belonging to the bankrupt estate, he is accountable to the bankruptcy court . . . . His accounts may be surcharged for any loss that his wrongful conduct may have occasioned. (p. 766)
 
 
 [5]
 Collier on Bankruptcy, Vol. 3A, § 62.03, outlines the standard applicable to a trustee in bankruptcy:
 (Trustees in bankruptcy) have a certain margin of discretion, and the courts will, in the interest of efficient administration, not fail to respect it. But whenever it comes to spending large sums of money or incurring debts for the purposes of administration, the trustee or receiver should bear in mind the final act of his tenure: the verified account to the court as provided in § 62a. True, by acting in his official capacity the trustee does not incur a personal liability as does the trustee of an express trust . . . . The bankruptcy trustee acts as the representative of a separate entity, the estate; he obligates this entity . . . . (T)he General Orders and § 62a constitute but a statutory application of a thoroughly recognized and time-honored mode of enforcing the court's supreme authority: the right to surcharge the accountable officer wherever the court finds that he misused his discretion . . . . This power to surcharge is the very essence of § 62a. It is this power that puts teeth and practical significance into an otherwise formal provision. (pp. 1406-09)
 
 
 [6]
 Billingsley collected the mail, and thus had exclusive knowledge of what checks came in. He kept the books, made out the checks, reconciled the bank statements, prepared the monthly reports. The trust hired a firm of accountants to prepare their tax returns, but these accountants merely took the figures as shown by Billingsley. Not even the most minimal precautions were taken to prevent Billingsley from doing what he did
 
 
 [7]
 In 1965 or 1966, Otey Johnson, the son of Roy Johnson and a residuary beneficiary of the trust, told Clark about a problem he had with Billingsley. Johnson had owed Billingsley money, but Billingsley, instead of waiting to be paid, had simply taken money representing excess payments of a note on property in Billingsley's name but belonging to the Ardmore Hospital. Billingsley was removed from the board of the hospital because of the incident
 
 
 [8]
 These include the following which are relevant here:
 1) Length of time elapsed between the breach and the bringing of suit; 2) whether the beneficiary knew or had reason to know of the breach; 3) whether the beneficiary had complained of the breach; 4) the reasons for delay in suing; 5) change of position by the trustee, including loss of rights against third persons; 6) death of witnesses or parties; 7) hardship to the beneficiary; 8) hardship to the trustee.