Arthur SHERR and Richard
Rubin, Appellants,

v.

L. W. WINKLER, Jr., Individually and as Trustee of Sierra Trading Corporation, a corporation in proceedings for reorganization, Appellee.

No. 76–1144.

United States Court of Appeals,
Tenth Circuit.

Submitted Jan. 27, 1977.

Decided April 1, 1977.

Paul B. Rodden and Robert R. Marshall, Jr., Rodden & Marshall, Denver, Colo. (Marilyn S. Bonner, Denver, Colo., on the brief), for appellants.

Robert J. Kapelke, Gorsuch, Kirgis, Campbell, Walker & Grover, Denver, Colo. (Frederic L. Kirgis and John S. Pfeiffer, Denver, Colo., on the brief), for appellee.

Before SETH, McWILLIAMS and BARRETT, Circuit Judges.

BARRETT, Circuit Judge.

Arthur Sherr and Richard Rubin, plaintiffs below, hereinafter referred to as plaintiffs, appeal from a judgment dismissing their action and complaint in a diversity suit in tort brought against L. W. Winkler, Jr., individually and as Trustee (Winkler) of Sierra Trading Corporation (Sierra). (On July 7, 1970, Sierra had filed for a Chapter X Reorganization, pursuant to 11 U.S.C.A. § 501, et seq., of the Bankruptcy Act.)

The complaint of plaintiffs alleged that Winkler, while serving as trustee for Sierra, (a) negligently and wrongfully caused the Reorganization Court to issue an *ex parte* Turnover Order resulting in delivery to the trustee of funds realized from production of oil belonging to plaintiffs, and (b) negligently failed to ascertain plaintiffs' interest in the subject properties, which was a matter of public record. Plaintiffs contend that as a result of Winkler's misconduct, they were required to intervene in the Reorganization proceedings in order to protect their interest in the properties. Plaintiffs sought damages allegedly incurred from Winkler's negligence: (a) $40,000.00 as attorneys' fees expended from the necessity to intervene in the Reorganization Court proceedings, (b) $7,200.00 as special damages for loss of use of the monies taken and used by Winkler, and (c) $150,000.00 in punitive damages, and interest and costs.

This case represents one segment of a saga which commenced in 1968, from which considerable litigation resulted. During that year Sierra owned a one-half (½) interest and American Petrofina Corporation (Petrofina) owned a one-half (½) interest in certain oil and gas leases known as the 'Ute Leases," situate in Campbell County, Wyoming. On December 16, 1968, Sierra assigned 75 percent of its one-half (½) interest in the Ute Leases to Rapp Oil Company (Rapp). Thereafter, Rapp mortgaged its entire interest in the Ute Leases to plaintiffs, and assigned to plaintiffs its entire interest in production from the Ute Leases to secure a loan from plaintiffs of $1,000,-000.00, bearing per annum interest of twenty percent (20%).

The mortgage and assignment documents from Rapp to plaintiffs were duly filed and recorded in the office of the County Clerk of Campbell County, Wyoming, in compliance with Wyoming recording statutes. Both a Division Order and a Title Opinion reflected the interest of Rapp in the Ute Leases following the 75 percent assignment from Sierra. These documents were in being when Winkler was appointed trustee on August 18, 1970. It is uncontradicted that Winkler did not check for any recorded interests, including those of Sierra, Rapp or plaintiffs to oil proceeds from the Ute Leases prior to the Reorganization Court Turnover Order hearing on September 4, 1970. A check of such records would have revealed the recorded rights of plaintiffs to all of Rapp's interest in oil proceeds realized from the "Ute" production. The Turnover Order of September 4, 1970, approved by Petrofina's attorney, directed that Winkler, as trustee, hold the proceeds until the further order of the Reorganization Court.

On September 30, 1970, the Reorganization Court ordered that a show cause hear-

ing be held on October 9, 1970, with respect to authorizing Winkler, as trustee, to use the funds turned over from Petrofina. Winkler did not send notice of the hearing to plaintiffs although the court directed that he give notice by mail to creditors, co-tenants, and other interested persons. Even so, at the October 9, 1970, hearing on Winkler's application for use of the funds, attorneys for plaintiffs appeared (having received actual notice), but the Court ruled that they lacked standing in the proceedings. An order was entered authorizing Winkler to use the funds for the operation, maintenance, and preservation of the assets of Sierra for a period of 90 days. Pursuant to that Order, total proceeds from production of the Ute Leases were delivered to Winkler. On January 6, 1971, an Order was entered extending the October 14, 1970, order for an additional six-month period, which was thereafter further extended to January 15, 1972.

On January 13, 1971, plaintiffs petitioned to intervene on a limited basis to protect their rights, if any, to any funds being held by trustee (Winkler) derived from the production of oil or gas. On April 19, 1971, plaintiffs were granted leave to intervene. On May 27, 1971, plaintiffs filed their "Petition to Reclaim Monies and to Modify Turnover Order." In their pre-trial statement and in the pre-trial order, plaintiffs sought recovery of their funds with "interest at the prevailing rate plus reasonable attorney's fees." [R., Vol. I, p. 30; R., Vol. II, pleadings 19 and 20, pp. 3 and 4]

Following proceedings in the Reorganization Court, Winkler filed a report on February 23, 1972, allocating $91,821.08 as the sum due plaintiffs. The report was adopted and ordered by the Reorganization Court. Appeal was taken to this Court. We reversed the Reorganization Court, in part, holding that plaintiffs should have been charged with only 37½ percent rather than 50 percent of the costs of development of the Ute Leases. Accordingly, plaintiffs were awarded an additional sum of $58,788.74, together with interest earned upon certificates of indebtedness purchased by

Winkler. At this point, it is to be noted that plaintiffs had recovered all monies they claimed to be then due and owing to them. Upon receipt of these funds, plaintiffs executed and filed a Satisfaction of Judgment.

The trial court, in the instant case, found that Winkler acted "in a fair and proper way in marshalling the assets" of the estate located in numerous states and even though personal notice of the October 9, 1970, hearing had not been given to plaintiffs, "it is significant they were represented at said hearing by counsel and detailed their interest in property to the Reorganization Court." [R., Vol. III, p. 66.] The Court reasoned, in reviewing the evidence, that Winkler acted in good faith, and without negligence in connection with the turnover proceedings and that his actions in the matters following the turnover orders were upon advice of counsel and with express approval and authorization of the Reorganization Court and pursuant to its orders. The Court found and/or concluded: "The alleged negligence consisted of acts pursuant to court authority. We expressly find no acts of negligence as alleged by plaintiffs." [R., Vol. III, pp. 86, 87.] The trial court also found that even though this Court enlarged upon the Reorganization Court's ruling relative to the amount of funds plaintiffs were entitled to as mortgagee-assignee of Rapp, that the acts of Winkler relating the turnover of the proceeds, their investment pending court proceedings and their ultimate disposition, were all taken in good faith, with court authorization, and "may not be the subject of any personal liability of Winkler to plaintiffs." [R., Vol. III, p. 87.] The Court found that Winkler's adverse position to plaintiffs throughout the detailed litigation "does not constitute negligence, bad faith, evil motive or reckless disregard of the rights of the plaintiffs." [R., Vol. III, p. 87.] In conclusion, the trial court found that Winkler had not violated his fiduciary responsibilities; that he had no justification to capitulate to the position taken by the plaintiffs in the Reorganization Court and several appeals to this Court; that Wink-

ler's steps taken to marshal, collect, and preserve assets of Sierra were in good faith and that no personal liability can be imposed in respect to his efforts, which were not a sham, evil or without legal justification. [R., Vol. III, p. 88.]

Some additional background, both in relation to Chapter X proceedings and other facts may be helpful. The duties of a trustee in bankruptcy are detailed pursuant to 11 U.S.C.A. § 75. It is provided under § 75a(1) that the trustees "shall (1) collect and reduce to money the property of the estates for which they are trustees, under the direction of the court, and close up the estates as expeditiously as is compatible with the best interests of the parties in interest." A corporate reorganization pursuant to Chapter X of the Bankruptcy Act, 11 U.S.C.A. § 501, et seq., is intended by the Congress to preserve the status quo, thus permitting amicable adjustment by debtor and creditors under supervision of the bankruptcy court, and avoiding liquidation with view to rehabilitating and maintaining a "going concern" for all parties in interest. *Claridge Apartments Co. v. Commissioner of Internal Revenue*, 323 U.S. 141, 65 S.Ct. 172, 89 L.Ed. 139 (1944); *Claybrook Drilling Company v. Divanco, Inc.*, 336 F.2d 697 (10th Cir. 1964). The proceeding under Chapter X is for purposes of rehabilitating and reorganizing the corporation, in contradistinction to a bankruptcy proceeding where liquidation of the corporation and distribution of its assets is the goal. *Caplin v. Marine Midland Grace Trust Co. of New York*, 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972).

The trial court found that Winkler acted in a fair and proper way in marshalling the assets of the estate located in numerous states and that following the hearing on October 9, 1970, Winkler acted properly, in good faith, and without negligence in connection with the turnover proceedings. [R., Vol. III, pp. 86, 87.] In *Sherr v. Sierra Trading Corporation*, 492 F.2d 971 (10th Cir. 1974), we recognized that the first of Winkler's compelling duties was that of entering into Wyoming leaseholds "to complete drill-

ing and place the oil wells in production." That Winkler's actions (which required that he personally spend more than three weeks in Wyoming attending to the arrangements for drilling and production operations) resulted in a benefit to Sierra's estate and other owners of interests in the leaseholds is evidenced, inferentially, from our prior observation that "It may very well be that the reorganization court may determine to direct the trustee to initiate suits in Wyoming or elsewhere to make claim upon the proceeds representing debtor's 25% interest realized from production, together with any claim the trustee may have against the interest of other owners out of such proceeds as reimbursement for costs expended in development, completion and production from the leaseholds." 492 F.2d at 977.

When Winkler was appointed to serve as trustee, he undertook his duties in accordance with the support of the majority and most of the large creditors of Sierra, i. e., to proceed to operate and manage the property of Sierra, under Chapter X. He is an independent oil operator with much experience in drilling and production. [R., Vol. I, p. 42.] In addition to general powers conferred upon the trustee by Chapter X of the Bankruptcy Act, 11 U.S.C.A. § 501, et seq., the Court granted Winkler broad, sweeping, discretionary powers, as trustee. Winkler moved expeditiously to collect some $200,-000.00 on accounts owing Sierra from operators of certain wells wherein Sierra owned interests. He then moved for permission to use those proceeds to meet urgent operating expenses in order to preserve Sierra's interests in certain leaseholds in Wyoming. Such consent was granted. The purpose was that of preserving Sierra as a "going concern." Garnering of funds for operations was utmost in Winkler's mind. In the same vein, the plaintiffs were concerned that the trustee would "dissipate" the funds realized from production belonging to them. [R., Vol. I, p. 15.] Plaintiffs' efforts over a three year span to gain possession of their proceeds, with interest, resulted in payment of attorney fees by plaintiffs of $40,000.00. [R., Vol. I, p. 16.] It is clear that plaintiffs at no time pursued a claim against the

trustee or otherwise in the Reorganization Court for reimbursement of any portion of the legal fees expended in obtaining the funds claimed. [R., Vol. I, pp. 35–38.]

Winkler had not served as trustee before this appointment. He did fully read and familiarize himself with the duties and powers vested in him as trustee as set forth in the order of his appointment. [R., Vol. I, pp. 42–44.] His first and immediate task was that of trying to "restore" production to the Ute properties in Campbell County, Wyoming. [R., Vol. I, p. 44.] In determining the nature of such properties and Sierra's interests therein, Winkler relied upon the advice of his counsel, even though all of Sierra's records had been turned over to him. [R., Vol. I, p. 45.] Winkler did not personally examine a Division Order, and he had no recollection of the plaintiffs' interests in the Ute Leases until the dispute ripened into a lawsuit following the Turnover Order in October of 1970. [R., Vol. I, pp. 45–48.] Winkler testified that he relied on his counsel to determine Sierra's interests in all assets. In response to a query as to whether he was not personally obligated to investigate to determine Sierra's interests, he responded: "Well, I could not have in any manner of speaking, could not have investigated all of the properties concerned personally at any time . . . I had to rely on attorneys throughout, and I directed them to or handed them first one and then another to make these determinations." [R., Vol. I, p. 49.] Prior to filing the turnover application, Winkler did not have personal knowledge of the interests owned by Sierra or others in the Ute Leases. [R., Vol. I, pp. 56–59.] The notices of the Turnover Order hearing held on October 9, 1970, were prepared by Winkler's attorney, involving creditors and approximately 55 wells located in Wyoming, Texas, West Virginia and Canada [R., Vol. I, pp. 61–63.] Winkler first learned of plaintiffs' interests through their attorney, Mr. Rodden, at a court hearing in October of 1970. [R., Vol. I, p. 63.] Winkler opposed returning any of the funds claimed by plaintiffs because Sierra had a claim against Rapp Oil corpora-

tion in excess of $500,000.00. That, of course, involved plaintiffs who were also claiming funds attributable to Rapp Oil. Furthermore, Winkler had concern for the bona fides of the business arrangement whereby Rapp Oil borrowed $1,000,000.00 from plaintiffs and executed a note bearing 20 percent per annum interest. [R., Vol. V, p. 65.]

Winkler invested all of the moneys delivered to him from Petrofina following the Turnover Order in certificates of deposit to the extent of $175,000.00. [R., Vol. I, pp. 65–66.] He testified, however, that certain of these funds were used, by permission of the Court, in the operation of the Sierra properties. [R., Vol. I, p. 67.] The plaintiffs' funds were not segregated. The Court did not require segregation. [R., Vol. I, p. 69.] Winkler ultimately sold all of Sierra's producing properties, following title checks by his attorney. He invested the proceeds in certificates of deposit to the extent of $250,000.00, with $12,000.00 retained in a checking account. [R., Vol. I, pp. 72, 73.] Winkler posted a required "professional bond" of $10,000.00 as trustee. [R., Vol. I, p. 74.]

Mr. John G. Gaudio testified as an attorney with much expertise in bankruptcy matters. He was admitted to practice in Colorado in 1952. He had extensive experience in regard to bankruptcy laws, organization, reorganization and services as both an attorney and trustee. [R., Vol. I, p. 76.] He had handled approximately 500 to 600 bankruptcy cases. [R., Vol. I, p. 78.] He testified that determination of title interests is the obligation of the trustee, but that, as to examination of title, that " . . . is the responsibility of the attorney but the basic information as to what is or is not potentially an asset must come to the attorney from the trustee." [R., Vol. I, p. 92.] As to checking title records, he stated that (in lieu of abstracts) it was the obligation of the attorney. [R., Vol. I, p. 93.]

In relation to the instant case, Gaudio testified that after the funds were delivered over to Winkler following the Turnover Or-

der and a claim had been made upon them by a third party (other than Debtor) ". . I would feel that providence would direct that I as an attorney instruct my trustee client that he should ask the Court to segregate these funds." [R., Vol. I, p. 102.] When asked whether a trustee would be personally liable to a third party who made his claim before the Reorganization Court as a Turnover Order hearing—with the trustee relying upon the Court's order—Gaudio stated that ". . . the question is was he reasonable in the depriving of that person [of his property notwithstanding] . . . this Court's Order . . . that he can use those funds . . . [this] does not in my mind give him protection." [R., Vol. I, p. 111.] Gaudio knew of no statute or state law which would allow an aggrieved party attorney fees in the pursuit of recovery of his funds. [R., Vol. I, p. 115.]

Winkler testified that following his appointment to serve "There was very little money available and properties that Sierra operated were all down and had been for several months and people were threatening cancellation of leases and there was one property [Snell well] that . . . would be forfeited if we did not have it into production by the 1st of October. . . . I was out . . . from two to three weeks in September on that well plus the wells in Weston County, Wyoming . . . Sierra had income probably of $3,000.00 a month not tied up . . . payroll obligations . . . engineer . . . and geologist had not been paid . . . I went to the field [in Wyoming] . . . about the 10th of September and I returned for my confirmation hearing on October the 2nd." [R., Vol. I, pp. 127–130]. Winkler said that Mr. Clark [the court appointed attorney for Sierra who was present but not called to testify before the District Court in the instant proceeding] suggested the Turnover Order to him and that he [Winkler] knew nothing of plaintiffs' claim until October 9, 1970, when he heard plaintiffs' attorney remark about it at the Reorganization Court hearing. [R., Vol. I, pp. 130–131.]

## I.

Plaintiffs contend that the trial court erred in finding that Winkler's actions were not negligent or wrongful and that plaintiffs were not entitled to the damages sought.

Plaintiffs argue that (a) it is elementary that good faith (as found by the trial court) is not a valid defense to either mismanagement or conversion nor is bad faith an element of either tort, (b) Winkler's reliance upon his attorney cannot protect him from liability simply because when a trustee hires an attorney to investigate the assets and liabilities of the estate he is not personally relieved of his duty "to observe the acts of the attorney and give him constant supervision," quoting from Bogert, Trusts and Trustee, § 556 2d ed, (c) because of his knowledge of the oil business, Winkler should have been aware of the need to check recorded interests and if he did not do so personally, he should have specifically directed his attorney to do so, and (d) Winkler cannot justify his actions by reliance upon the Reorganization Court's approval of his actions because when the Court entered the *ex parte* Turnover Order approving Winkler's application, the Court had not been properly advised of plaintiffs' interest and was in fact misled by Winkler's assertion that Sierra was entitled to the proceeds.

In response to Winkler's argument that as trustee he was obligated to marshal and protect the estate's assets, plaintiffs say that such obligation does not supersede a trustee's obligation to insure that he does not take the property of American citizens without the due process rights, i.e., notice and opportunity to be heard. In answer to Winkler's claim that the Reorganization Court decided that when plaintiffs' attorneys appeared at the turnover application hearing (without prior written notice) they not be permitted to participate in the hearing without first filing a petition to intervene, plaintiffs contend this decision was, in fact, not made at the sole discretion of the Court but instead was demanded by Winkler's reliance upon 11 U.S.C.A §§ 606, 607

and 6A, Collier on Bankruptcy, pp. 306–307, for the uncontroverted rule that plaintiffs could not participate in that hearing except and only by virtue of formal intervention procedure. *This, plaintiffs contend, goes precisely to the heart of the damage issue, for while plaintiffs had no right to participate or to be heard at the Turnover Order hearing, their property was taken without any semblance of due process.*

■ The Congressional scheme pertaining to corporate reorganizations under Chapter X was that of offering greater inducements to achieve financial rehabilitation with considerable flexibility in management decisions. *Caplin v. Marine Midland Grace Trust Co. of New York, supra.* To effectuate the purpose of Chapter X, it was intended that the Reorganization Court would not be subjected to interference by acts of others or by proceedings in other courts which might tend to hinder progress of reorganization and that traditional concepts of property, title and separate entities may have to give way. *In Re Imperial "400" National, Inc.,* 429 F.2d 671 (3rd Cir. 1970); 11 U.S.C.A. §§ 501, et seq., 511.

■ A trustee appointed and serving in a reorganization proceeding is a fiduciary who has an obligation to treat all parties fairly. *Wolf v. Weinstein,* 372 U.S. 633, 83 S.Ct. 969, 10 L.Ed.2d 33 (1963). The standard applicable to the surcharge of a bankruptcy trustee is negligence. *Mosser v. Darrow,* 341 U.S. 267, 71 S.Ct. 680, 95 L.Ed. 927 (1951).

*In Re Johnson,* 518 F.2d 246 (10th Cir. 1975), *cert. denied,* 423 U.S. 893, 96 S.Ct. 191, 46 L.Ed.2d 125 (1975), held that the standard of care for a bankruptcy trustee is the exercise of due care, diligence and skill both as to affirmative and negative conduct; and that the standard or measure of care, diligence and skill is that of an ordinarily prudent man in the conduct of his private affairs under similar circumstances and with similar objects in view. In *Johnson* the trustee, appointed under Chapter XII, employed a bookkeeper who received all of the income from the trust and had absolute control over all expenditures.

Commencing in 1960 and continuing to 1969, the bookkeeper embezzled about $50,-000.00 of the trust funds. The trustee failed to check on the bookkeeper's work, books and accounts in any manner. Accountants discovered the defalcations. We carefully noted that the trustee's action was not merely a matter of error in judgment for if it were the trustee could not be held responsible. In this regard we cited to Collier on Bankruptcy, Vol. 3A, § 62.03, for the proposition that trustees in bankruptcy have a certain margin of discretion which the courts will respect.

While it would appear that an ordinary trustee is more strictly held accountable for obligations which arise out of contracts or out of torts made or committed by the trustee or by his authorized agents [Scott on Trusts, Vol. 2, 1939, § 262, pp. 1471–1473; § 264, pp. 1485–1490; § 225.1, pp. 1191–1192; Bogert, Trusts and Trustees, § 731; 123 A.L.R. 458; Restatement of the Law, Second, Trusts 2d, §§ 261, 262 (1959)], the same rule has not been applied to receivers or trustees in bankruptcy who act in good faith and without fault or negligence. In *Barton v. Barbour,* 104 U.S. 126, 26 L.Ed. 672 (1881), the Court first recognized the above rule. That case dealt with a suit seeking to establish a claim against a receiver of a railroad company for personal injuries sustained by reason of a defective rail, which resulted from negligence of one of the receiver's employees. Leave of the Court was a prerequisite for such suit, and it had been denied. The claimant argued that in view of the fact that the receiver was in possession of, and conducting the business of the railroad as a common carrier he was liable just as if the business was being conducted by the common carrier itself. The Court reasoned that such a receivership proceeding was impressed by both private and public interests and that the court having jurisdiction over the receivership must be granted legal discretion to allow or disallow an injured party to sue the receiver in his official capacity. The court seemed clearly to have held that under those factual circumstances, the only claim, if allowed, would lie against the re-

ceivership estate. *See also*: *Vass v. Conron Bros. Co.,* 59 F.2d 969 (2nd Cir. 1932).

■ Where the liability to a third person results from the acts of an agent or employee properly employed by the trustee (under circumstances wherein the trustee is not personally at fault) and the trustee is held to be liable to the third person, he is entitled to indemnity out of the trust estate. Restatement of the Law, Second, Trusts 2d, §§ 246, 247, 248 (1959).

This Court observed in *Sullivan & Cromwell v. Colorado Fuel & Iron Co.,* 96 F.2d 219 (10th Cir. 1938), that corporate reorganization proceedings under the Bankruptcy Act involved complications not attendant upon formal trusts:

> . . . It is common knowledge that the affairs of a debtridden corporation are sometimes so complicated that skill, patience, and extended consideration of many factors covering a long period of time are required to effect a fair and equitable plan of reorganization. . .

96 F.2d, at 221.

■ The question of personal liability of an executor, administrator or other fiduciary from loss resulting from negligence or fault of agents or attorneys properly employed is essentially one of good faith and reasonable diligence, and where good faith appears, acts of the fiduciary are to be treated with indulgence and mistaken judgment is not enough to impose liability. *Kaufman v. Kaufman,* 292 Ky. 351, 166 S.W.2d 860 (1942); 144 A.L.R. 866. A trustee in bankruptcy is charged with the obligation of gathering the assets of the bankrupt and to manage the property with diligence. *In Re Johnson, supra; Leonard v. Vrooman,* 383 F.2d 556 (9th Cir. 1967), *cert. denied,* 390 U.S. 925, 88 S.Ct. 856, 19 L.Ed.2d 985 (1968). We have recognized the distinction between corporate reorganization under Chapter X and "straight" bankruptcy in *In Re Public Leasing Corporation,* 488 F.2d 1369 (10th Cir. 1973):

> The reorganization petition was not a petition in bankruptcy in the ordinary sense of that term. It did not contemplate collection and distribution of the assets of Public Leasing ratably to creditors and the discharge of Public Leasing from its debts. On the contrary, it contemplated an arrangement by which Public Leasing could continue in business and pay its debts to the extent and in the manner provided by the confirmed plan. 488 F.2d, at 1374.

*Mosser v. Darrow, supra,* established the rules that a trustee or receiver in bankruptcy is (a) not liable, in any manner, for mistake in judgment where discretion is allowed, (b) liable *personally* only for acts determined to be willful and deliberate in violation of his duties and (c) liable, in his official capacity, for acts of negligence. We do not read *In Re Kuhn Bros.,* 234 F. 277 (7th Cir. 1916) cited by plaintiffs (Appellants' Brief, p. 10) for the broad rule that a trustee in bankruptcy is *personally* liable, and we disagree with plaintiffs' interpretation of *Mosser v. Darrow, supra,* in the same vein. There the court held that a reorganization trustee would not be liable *personally* except for willful and deliberate acts. The Court said:

> . . . The liability here is not created by a failure [of the reorganization trustee] to detect defalcations, in which case negligence might be required to surcharge the trustee, but is a case of a willful and deliberate setting up of an interest in employees adverse to that of the trust.

341 U.S., at 272, 71 S.Ct. at 682.

■ Thus, a trustee in bankruptcy is not be be held personally liable unless he acts willfully and deliberately in violation of his fiduciary duties. A trustee in bankruptcy may be held liable in his official capacity and thus surcharged if he fails to exercise that degree of care required of an ordinarily prudent person serving in such capacity, taking into consideration the discretion allowed. The rule applies to the trustee's selection and supervision of his agents and employees. *Moulded Products, Inc. v. Barry,* 474 F.2d 220 (8th Cir. 1973), *cert. denied,* 412 U.S. 940, 93 S.Ct. 2779, 37 L.Ed.2d 400 (1973); 14 A.L.R. 360; Anno.,

123 A.L.R. pp. 463, 464; 9 Am.Jur.2d, Bankruptcy, § 1538; Remington on Bankruptcy, Vol. 6, § 2948; Vol. 11, § 4507 (1961). We hold that this record does not evidence any acts by Winkler toward the plaintiffs which render him liable to plaintiffs individually or in his official capacity.

Some courts have held that trustees appointed by the court to "wind up" the business of a dissolved corporation cannot be held personally liable because they are arms of the court. *Riedell v. Stuart,* 151 Okl. 266, 2 P.2d 929 (1931); 76 A.L.R. 1469 (1931). We reiterate that the distinction between trustees in bankruptcy and ordinary trustees or fiduciaries in terms of degree of discretion is based on public policy recognizing the complications of bankruptcy proceedings. *Ziegler v. Pitney,* 139 F.2d 595 (2d Cir. 1943); Restatement of the Law, Second, Trusts 2d, § 264. Thus, it has been said that "A fact of bankruptcy life is that the creditor interests and therefore the trustee's side of the case tends to be controlled by the trustee's attorney rather than the trustee. In theory, the trustee selects his attorney but in practice it is often the case that creditors receiving a notice of bankruptcy will . . . vote for a trustee . . . [who is] . . . an experienced bankruptcy attorney." Cowans, Bankruptcy Law and Practice, § 855, p. 453 (1963); 8B C.J.S. Bankruptcy § 635; 9 Am.Jur.2d, Bankruptcy, § 1539. The trustee's duties do not require him to perform legal services. *In Re Hamilton Distributors, Inc.,* 440 F.2d 1178 (7th Cir. 1971); *In Re Orbit Liquor Store,* 439 F.2d 1351 (5th Cir. 1971); Cowans, Bankruptcy Law and Practice, § 855, 1973 Cum.Supp.

There is substantial evidence supporting the factual determinations and/or conclusions of the trial court that Winkler acted properly, in good faith and without negligence in connection with the turnover proceedings and in all matters relative to plaintiffs' reclamation proceeding based upon the advice of his counsel and pursuant to court orders. We deem it particularly significant that all parties understood that Winkler was appointed to serve as trustee because of his experience and expertise in the field of drilling for and producing oil. The record bespeaks of the immediate and apparently continuing demands upon Winkler's expert services in the "field". He spent three harried weeks attending to urgent demands in the oil fields of Wyoming placing various wells on production and making arrangements to protect some leasehold interests of Sierra from loss or termination. There is nothing supporting a finding that Winkler committed any willful or deliberate act or acts violative of his fiduciary duties which would render him *personally* liable to plaintiffs. And we agree with the trial court's findings that Winkler did not commit acts of negligence in his official capacity which would render him liable to the plaintiffs as trustee.

We concede that, arguably, Winkler may have placed more reliance on his counsel than he should have relative to plaintiffs' claim and that personal inquiry and/or investigation by Winkler relative to plaintiffs' claim was warranted. These observations are made, however, in isolation and in retrospect. We cannot judge whether Winkler could have or should have focused more time and attention on plaintiffs' claim in view of the myriad of demands upon his time and expertise. The record reflects that a great deal of his service was "in the field," far removed from any administrative office. We thus hold that the factual determinations of the trial court that Winkler was not negligent are not clearly erroneous. Fed.R. Civ.P. rule 52(a), 28 U.S. C.A.; *Prisbrey v. Noble,* 505 F.2d 170 (10th Cir. 1974); *Schafer v. Hammond,* 456 F.2d 15 (10th Cir. 1972); 4 Collier on Bankruptcy, § 67.37 (4th ed. 1971). A trustee may not be held liable in his official capacity for losses occasioned by the negligence, incompetency, or even dishonesty, of his agents and employees unless he fails to use reasonable care in the conduct of his fiduciary duties. *Moulded Products, Inc. v. Barry, supra; In Re Johnson, supra;* Remington on Bankruptcy, Vol. 6, § 2948, p. 597; 9 Am.Jur.2d, Bankruptcy, § 1538; Remington on Bankruptcy, Vol. 11, §§ 4513–4516.

## II.

In view of our disposition of the negligence contentions, we need not belabor the remaining issues. We hold, however, that the trial court's findings and conclusions in support of its application of the doctrine of *res judicata* as a bar to the instant action are well grounded. The issue of allowance of plaintiffs' attorney fees was in fact presented to the Reorganization Court in the reclamation proceeding, involving the identical parties involved here, arising from the same subject matter.

It has been held that the bankruptcy court may, in its discretion, tax attorneys' fees as costs. *In Re Designaire Modular Home Corporation,* 517 F.2d 1015 (3rd Cir. 1975); *In Re Carico,* 308 F.Supp. 815 (E.D.Va.1970); *In Re Swofford,* 112 F.Supp. 893 (D.C.Minn.1952). Such has been upheld based upon the general equity power of the bankruptcy court and a broad interpretation of "costs" as set forth in 11 U.S.C.A. § 11(a)(18). The rule in this circuit, however, is that expenses of litigation, with the exception of court costs proper, cannot be recovered by the prevailing party as an element of damage in the absence of an express statutory or contractual provision allowing them or when the injury results from willful or intentional wrongdoing. *Misco Leasing, Inc. v. Keller,* 490 F.2d 545 (10th Cir. 1974); *Wilshire Oil Company of Texas v. Riffe,* 409 F.2d 1277 (10th Cir. 1969); 37 A.L.R.3d 1341; *Carter Electric Company v. Travelers Indemnity Company,* 382 F.2d 567 (10th Cir. 1967). The same rule was applied in Colorado. *Publix Cab Co. v. Colorado National Bank of Denver,* 139 Colo. 205, 338 P.2d 702 (1959); 78 A.L. R.2d 198.

WE AFFIRM.